Arline M. SODERBECK,
Plaintiff-Appellant,

v.

BURNETT COUNTY, WISCONSIN; Robert Kellberg, individually and as Sheriff of Burnett County; and Lowell Nelson, Eugene Wellman, and Carl A. Brandenburg, Defendants-Appellees.

and

Arline M. SODERBECK,
Plaintiff-Appellee,

v.

BURNETT COUNTY, WISCONSIN, and Robert Kellberg, individually and as Sheriff of Burnett County, Defendants-Appellants.

Nos. 83–3232, 83–3161 and 84–1437.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 26, 1984.

Decided Jan. 4, 1985.

Joseph B. Marshall, Marshall & Assoc., P.A., Circle Pines, Minn., for Arline Soderbeck.

Thomas D. Bell, Doar, Drill & Skow, S.C., New Richmond, Wis., for Burnett County and Robert Kellberg, et al.

Before CUMMINGS, Chief Judge, and POSNER and FLAUM, Circuit Judges.

POSNER, Circuit Judge.

Arline Soderbeck brought this suit under section 1 of the Civil Rights Act of 1871, now 42 U.S.C. § 1983, against Robert Kellberg (the Sheriff of Burnett County, Wisconsin), the three members of the county's Law Enforcement Committee, and the county itself. She alleges that she was fired from her job in the sheriff's office in violation of her rights under the First Amendment, made applicable to state action by the Fourteenth Amendment. She had been hired to work in the sheriff's department when her husband was the sheriff, but Kellberg defeated Soderbeck in a subsequent election for sheriff and the first thing he did on taking office in 1979 was to fire Mrs. Soderbeck. The jury was entitled to find that Kellberg's only reason for firing her was that she was the wife and presumed ally of his political adversary.

At the close of the plaintiff's case in chief, the district judge directed a verdict for the three members of the Law Enforcement Committee; later the judge awarded them attorney's fees of $30,110.62 and costs of $3,061.18. The jury brought in a verdict against the remaining defendants, that is, Sheriff Kellberg and Burnett County, of $33,375 in compensatory damages

and $5,000 in punitive damages (the latter against Kellberg only). The judge held that an award of punitive damages was improper in the circumstances, but entered judgment for the compensatory damages that the jury had awarded. The sheriff and the county have appealed from this judgment, while Mrs. Soderbeck has appealed from the denial of punitive damages, the directed verdict for the members of the Law Enforcement Committee, and the award of attorney's fees to them.

A public agency that fires an employee because of his political beliefs or political affiliations infringes his freedom of speech, see *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), but there are exceptions to this principle, carved out to minimize its adverse impact on the effective functioning of government. For example, employees at the policy-making level of government can be fired on political grounds. *Id.* at 367–68 (plurality opinion); *Shakman v. Democratic Organization of Cook County,* 722 F.2d 1307, 1309–10 (7th Cir.1983) (per curiam). Mrs. Soderbeck was not a policy maker; but if, as the defendants argue, she was the sheriff's confidential secretary, then Kellberg could fire her without violating the Constitution. See *Stegmaier v. Trammell,* 597 F.2d 1027, 1038 (5th Cir.1979) (dictum). You cannot run a government with officials who are forced to keep political enemies as their confidential secretaries, and Mrs. Soderbeck was the political enemy of her husband's political enemy, Kellberg. Any implication of the plurality opinion in *Elrod v. Burns* that only a policy maker is unprotected by the principle announced in that case was superseded by the broader formulation in the majority opinion in *Branti v. Finkel,* which allows an employee to be fired if "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1294. See also *Livas v. Petka,* 711 F.2d 798, 800–01 (7th Cir.1983). It need not be a policy-making

office. If Rosalynn Carter had been President Carter's secretary, President Reagan would not have had to keep her on as his secretary.

Mrs. Soderbeck, however, had been trained as a bookkeeper and her title was bookkeeper, not secretary or confidential secretary; and though she did do most of the typing in the sheriff's office, there was evidence that if the sheriff needed something typed he would hand his handwritten draft to whoever in the office was handy. Burnett County has a population of only 12,000 and a tiny sheriff's office whose six employees at the time of Mrs. Soderbeck's termination did not have sharply differentiated tasks; it was only after she was fired that a position of "confidential secretary" was created with a different job description from that of the bookkeeper's position that Mrs. Soderbeck had occupied. So while she did typing and handled legal papers, such as summonses and warrants, the other employees did these things too. She also did janitorial work, and performed domestic chores for the prisoners in the county jail (which is in the same building as the sheriff's office and home) as jail matron and laundress—not the usual functions of a confidential secretary. And she did not take dictation—no one in the office did. If she could be fired as a confidential employee, so could anyone else employed in the office, on the theory that if an office is small enough the tasks usually performed by the boss's personal secretary may be parcelled out among all the employees.

This is not to say that Mrs. Soderbeck was, as a matter of law, an employee who could not be fired because of her political affiliation. It is to say merely that the question was sufficiently uncertain to be one for the jury to decide. The defendants argue that whether or not an employee exercises a policy-making role or is a repository of confidences that make loyalty an essential part of his job description should always be a question of law, but we cannot agree with this point, for which no authority is offered, and which has been rejected

in previous cases in this and other circuits. See, e.g., *Nekolny v. Painter*, 653 F.2d 1164, 1169 (7th Cir.1981); *Stegmaier v. Trammell, supra*, 597 F.2d at 1034 n. 8, and cases cited there. Rightly or wrongly, our system commits the decision of complex as well as simple facts, facts tinctured with legal or policy significance (such as negligence) as well as the who-did-what-to-whom facts that can be found without any instruction in the law, to the jury in cases in which a right to a jury trial is given. Maybe some facts are so difficult for laymen to determine that they can be withdrawn from the jury; this is the theory (or rather a theory) of the equity accounting, see, e.g., *Medtronic, Inc. v. Intermedics, Inc.*, 725 F.2d 440, 443 (7th Cir.1984), and is the basis for the Third Circuit's interesting ruling (on which of course we need take no position here) that trial by jury violates due process of law if the suit "is too complex for a jury to understand and decide rationally." *In re Japanese Electronic Products Antitrust Litigation*, 631 F.2d 1069, 1090 (3d Cir.1980); contra, *In re U.S. Financial Securities Litigation*, 609 F.2d 411, 431 (9th Cir.1979); see generally Comment, *Complex Civil Litigation and the Seventh Amendment Right to a Jury Trial*, 51 U.Chi.L.Rev. 581 (1984). But the question whether or not a clerical worker is a policy-making or confidential employee is not of such character.

Although we therefore think the district judge was right not to disturb the jury's verdict of compensatory damages, we also think she was right to rescind the award of punitive damages. This conclusion requires us to resolve a question left unanswered by *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), where the Supreme Court held that punitive damages will lie for reckless as well as intentional violations of section 1983. The question is whether it is ever necessary to show that the defendant knew he was violating the plaintiff's legal rights.

In a recent section 1983 case we approved an instruction that allowed the jury to award punitive damages if it found the defendant's actions "maliciously or wanton-ly or oppressively done" and that defined these adverbs as follows: "An act or a failure to act is maliciously done if prompted or accompanied by ill will or spite or grudge either toward the injured person individually or toward all persons in one or more groups or categories of which the injured person is a member"; "wantonly done if done in reckless disregard or callous disregard of or indifference to the rights of one or more persons including the injured person"; "oppressively done if done in a way or manner which injures or damages or otherwise violates the rights of another person with unnecessary harshness or severity as by misuse, or abuse of authority, or power, or by taking advantage of some [weakness] or disability or misfortune of another person." *McKinley v. Trattles*, 732 F.2d 1320, 1326 n. 2 (7th Cir.1984) ("weakness" bracketed in original). This is a standard punitive-damages instruction, see 3 Devitt & Blackmar, Federal Jury Practice and Instructions § 85.11 (3d ed. 1977), which though not tailored to civil-rights cases is commonly used in them, see, e.g., besides *McKinley v. Trattles, Abraham v. Pekarski*, 728 F.2d 167, 172 n. 2 (3d Cir.1984). Although the instruction conveys a mood (perhaps none too clearly to the average juror) rather than establishing precise criteria, it does imply distinct types of misconduct—though, as it seems to us, two rather than three. In the first, the defendant actually derives satisfaction from hurting the plaintiff; in the second, the defendant, while not having any particular desire to hurt the plaintiff, tramples on the plaintiff's rights, in a fashion that can fairly be called reckless, to accomplish his own aims. This distinction corresponds to the distinction in the criminal law between deliberate and reckless harm. If a man sets fire to a house intending to kill the occupants, he is a deliberate murderer; if he sets fire to a house he knows to be occupied, but does so to warm himself rather than to kill the occupants, he is a reckless murderer. But he is a murderer in either case, and would be subject to punitive damages in a suit for wrongful death.

The distinction between deliberate and reckless wrongdoing is well captured by the Supreme Court's formulation of its holding in *Smith v. Wade:* "We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." 103 S.Ct. at 1640.

■ Although there was some evidence in this case of personal spite by Kellberg toward the Soderbecks as well as political rivalry, and spite would bring the case within the first type of conduct for which punitive damages is a proper sanction, the special-verdict form, not challenged by the plaintiff, confined the jury to the second: "In terminating plaintiff Arline Soderbeck's employment with the Burnett County Sheriff's Department, did defendant Robert Kellberg act with reckless indifference to the plaintiff's rights not to be terminated for her associations or political activity?" (It is no doubt regrettable that the instructions to the jury did not define "reckless indifference," cf. *United States v. McAnally,* 666 F.2d 1116, 1119 (7th Cir. 1981); *United States v. Hanlon,* 548 F.2d 1096, 1101–02 (2d Cir.1977), as the legal meaning of the term is unlikely to be obvious to the average juror; but no complaint was made on that score.) This formulation allowed the jury to award punitive damages even if it found that Kellberg had fired Mrs. Soderbeck not to hurt her but just to make life easier for himself; and the district judge was quite right to hold that the evidence did not permit an award of punitive damages on this basis (that is, on the basis of recklessness).

The difference between deliberate and reckless harm is the difference between wanting to hurt someone and knowing that hurting someone is a highly likely consequence of an act undertaken for a different end. But in the latter case there must be knowledge of the danger that the defendant's act creates, which in this case is a danger of depriving a public employee of her freedom of speech; and the knowledge of this danger presupposes some knowledge of the free-speech rights of public employees.

■ This point can be made clearer by noting that a primary purpose (we think *the* primary purpose) of punitive damages, both generally and in section 1983 cases, is to deter. See, e.g., *Smith v. Wade, supra,* 103 S.Ct. at 1636, 1639; *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 266–67, 269–70, 101 S.Ct. 2748, 2759, 2760–61, 69 L.Ed.2d 616 (1981); Prosser and Keeton on the Law of Torts § 2, at p. 19 (5th ed. 1984). Unless the defendant knew that the conduct which resulted in the injury to the plaintiff was forbidden, an award of punitive damages will have no deterrent effect. This is the basis on which the Supreme Court has created a limited good-faith exception to the exclusionary rule, a rule whose current rationale is a deterrent one. See *United States v. Leon,* — U.S. —, 104 S.Ct. 3405, 3412, 82 L.Ed.2d 677 (1984).

■ If Kellberg had not fired but instead had arrested Mrs. Soderbeck, without any basis other than antipathy to her political connections, an award of punitive damages would clearly have been appropriate, even if no spite could be shown. Every law-enforcement officer in the United States knows—or had better learn—that the law places limits on the authority of the police. But a police officer in a small rural county, even a police chief or a sheriff, cannot be assumed to know that if he fires, on the most natural of political grounds, a clerical employee whose loyalty he has some reason to regard as a legitimate job qualification, he may be violating the law. His ignorance would not necessarily immunize him from liability for compensatory damages; Kellberg does not even argue that as the law stood when he acted, he could *reasonably* have believed that he was justified in what he did, and therefore is immune from all damage liability. See *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). But if we therefore assume that Kellberg should have known that he was

not privileged to fire Mrs. Soderbeck, still it would not follow that his ignorance of her rights was reckless; careless is not reckless.

 The words used to mark off the domain of punitive damages—words like "maliciously," "wantonly," "oppressively," "spitefully"—indicate that punitive damages, like criminal fines which they resemble, are reserved for cases where the wrongfulness of the defendant's conduct is conspicuous, implying that its wrongfulness is apparent to the person who engages in it, and not just to a lawyer. If one needed great subtlety to realize that one had strayed into the forbidden zone where punitive damages are a sanction, the deterrent effect of such damages would be distorted. Some people would stray into the zone unknowingly; as to them the threat of punitive damages would not deter. Others would steer far clear of the zone, not knowing where it began; as to them lawful as well as unlawful conduct would be deterred. We may therefore set it down as a condition of awarding punitive damages that the defendant almost certainly knew that what he was doing was wrongful and subject to punishment. Among the types of conduct that fit this description is conduct so contrary to our society's basic ethical principles that it can safely be assumed to have been undertaken with knowledge that it was legally as well as morally wrong, including conduct that has come to be regarded as contrary to the modern civil rights, as well as the older personal liberties, of Americans.

 But the discharge of public employees on political grounds is not yet regarded in the light of something contrary to natural law; nor is it widely known in nonlegal circles to be a federal constitutional tort or any other sort of tort. Hence knowledge that it is forbidden cannot automatically be imputed to the individuals responsible for such discharges—especially when the individual is a minor rural official with no legal training. Burnett County in northwestern Wisconsin cannot be among the more sophisticated of the nation's counties and its sheriff cannot be presumed to be steeped in the arcana of modern constitutional law. *Elrod v. Burns* was decided only three years before Mrs. Soderbeck was fired—over a vigorous dissent of three Justices, and without a majority opinion, which suggests it was something of a novelty. *Branti* was decided after she was fired. Of course knowledge is to some extent a function of the penalties for ignorance; the heavier the sanctions for an unknowing violation of someone's rights, the more will be invested in finding out what rights people have. But if Kellberg had consulted a lawyer, he might well have been advised that he could fire Mrs. Soderbeck because she was a confidential employee; it was an arguable point, though one the jury resolved against him. And this point shows why the maxim, "ignorance of the law is no defense" (on which see Perkins & Boyce, Criminal Law 1029–36 (3d ed. 1982)), is a maxim of criminal law, not of civil law. The requirement of fair notice in criminal cases gives reasonable assurance that the potential violator will know whether his conduct will be unlawful; there is no similar assurance in civil cases, as this case illustrates.

 Although the plaintiff was free to present evidence from which a jury might infer that Sheriff Kellberg in fact knew, or circumstanced as he was should certainly have known, that he was violating her federal constitutional rights (as in *Busche v. Burkee*, 649 F.2d 509, 520 (7th Cir.1981), a good example of a section 1983 case where punitive damages for firing a public employee were upheld), she presented no such evidence. The judge was therefore right to take the issue of punitive damages—defined as we have said in terms of "reckless indifference" to the plaintiff's rights—away from the jury. But in so holding, we wish to make clear that Kellberg's ignorance of Mrs. Soderbeck's *federal* rights would not matter if his firing of her had been the kind of act that anyone (or at least any sheriff) would know violated some law. In *Smith v. Wade*, the defendant Smith may not have known that he was violating

the Eighth Amendment when he took no steps to protect inmate Wade from being beaten and sexually assaulted; but since Wade had placed himself in protective custody because of prior assaults against him, since another inmate in the same dormitory had recently been beaten to death while Smith was on duty, and since Smith had assigned to Wade's cell an inmate who had recently been punished for fighting, Smith ought to have known he was violating some legal duty of protection toward an inmate in his care. Just as it is not necessary in order to convict a person of a federal crime to prove that he knew the facts that confer federal jurisdiction over the offense, see, e.g., *United States v. Feola*, 420 U.S. 671, 684, 95 S.Ct. 1255, 1263, 43 L.Ed.2d 541 (1975); *United States v. Harris*, 729 F.2d 441, 445–46 (7th Cir.1984), it is not necessary in order to justify awarding punitive damages to show that the defendant ought to have known he was violating the plaintiff's federal rights. The point in both cases is that once the defendant is shown to have engaged in plainly unlawful conduct, to require a showing that the defendant knew which sovereign's laws he was violating would simply reduce the deterrent effect of punishment by making it harder to prove a violation.

 Burnett County argues that the jury should not have been allowed to find it liable along with Kellberg; that it is immune from liability under section 1983 by virtue of a Wisconsin constitutional provision that was adopted in 1848, well before the Civil Rights Act of 1871 and therefore (or so at least the county argues, by analogy to other preexisting immunities, such as that for judges, *Pierson v. Ray*, 386 U.S. 547, 553–55, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967)) implicitly incorporated into the act. The provision (repealed after Mrs. Soderbeck was fired, see Wis.Stat. Ann., Const., Art. 6, § 4 (1984–1985 Pocket Part)) is that "the county shall never be made responsible for the acts of the sheriff." Wis. Const. Art. 6, § 4. It is intended to "spare the county treasury from liability to third parties damaged by the acts of the sheriff," *Bablitch & Bablitch v.*

*Lincoln County*, 82 Wis.2d 574, 579, 263 N.W.2d 218, 221 (1978), which is to say, derivative liability based on the status of the county as the sheriff's employer. But as this just means *respondeat superior*, it is apparent that the provision is irrelevant to the county's liability under section 1983. Regardless of any preexisting state-law immunities, agencies of state and local government are not liable under section 1983 on a theory of *respondeat superior*, that is, in their capacity as employers of the persons who commit the actual civil rights violation. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Burnett County is liable if at all to Mrs. Soderbeck only for its own acts, and the provision of the Wisconsin constitution on which the county relies does not purport to immunize counties from liability for their own acts.

 The provision is not entirely a red herring in this case, however. Since a county can act only through people, to conclude that a county has violated section 1983 requires deciding whose acts are attributable to the county, and the answer given by the cases is that the acts of the county's policy makers are. See, e.g., *id.* at 694, 98 S.Ct. at 2037; *Reed v. Village of Shorewood*, 704 F.2d 943, 953 (7th Cir. 1983); *Languirand v. Hayden*, 717 F.2d 220, 227 (5th Cir.1983). The immunity provision is powerful evidence that the Sheriff of Burnett County was not a policy-making official of the county at the time he fired Mrs. Soderbeck, but instead was an autonomous official, in much the same way as the Mayor of Chicago is not an official of Cook County. See also *Andreski v. Industrial Comm'n*, 261 Wis. 234, 240, 52 N.W.2d 135, 137 (1952). But we need not pursue this issue, as the plaintiff made no effort to show that the sheriff is a policy-making official of the county government. The basis on which she tried to implicate the county in the sheriff's wrongdoing was different; it was the involvement of the members of the county's Law Enforcement Committee. The governing body of the

county is its Board of Supervisors, which operates through committees. The Law Enforcement Committee is one, and it is in charge of the budget for the sheriff's department. Although the committee unquestionably is a policy-making body whose acts are the county's acts for purposes of section 1983, the district judge directed a verdict for the committee members on the ground that the committee had no legal authority to fire Mrs. Soderbeck. If the grant of directed verdict was correct, then Burnett County should be dismissed from the case too, because its liability is derivative from that of the members of the Law Enforcement Committee.

■ Whether the committee had the authority to fire Mrs. Soderbeck is not the important question. If it fired her without having the authority to do so, this just means it violated state as well as federal law. The important question is whether it participated in her firing. On this the record shows the following. It was the Law Enforcement Committee rather than the sheriff that had hired Mrs. Soderbeck to work in the sheriff's department; her husband was sheriff at the time and would have had a conflict of interest in hiring his own wife. So when Mrs. Soderbeck learned that Sheriff Kellberg wanted to fire her, naturally she called Lowell Nelson, the chairman of the committee, and asked him what to do. Nelson told her to stay put, but then he called Kellberg and later he called Mrs. Soderbeck back and told her she had better pack her things and leave. Nelson was also seen talking with Kellberg in person before the second phone conversation with her. Mrs. Soderbeck appeared at a public meeting of the committee to protest her firing by Kellberg, but the committee refused to intervene. Whether the committee went further and actually approved the firing was hotly contested, but the jury could have believed that the committee announced at the meeting that it would stand behind the sheriff's decision. There was also testimony that the committee had reversed a suspension by the previous sheriff. As a matter of fact, this was the suspension of Kellberg

by Sonderbeck, when the latter had been sheriff and the former had been undersheriff and had just announced his candidacy for sheriff at the next election. This was part of the history of animosity between these two that might have allowed a jury to base a judgment for punitive damages on a finding that Kellberg's firing of Mrs. Sonderbeck had been motivated by spite—if the punitive-damages issue had been put to the jury on a theory of spite, which, as we said, it was not.

■ If all Nelson had done was relay to Mrs. Soderbeck Kellberg's decision, taken without consultation with Nelson, to fire her, and if all the committee had done was to turn down her appeal, the members of the committee and therefore the county as well would not be liable under section 1983. (This is quite apart from the question whether in turning down her appeal the committee would have been acting in a judicial capacity, which would have made the members absolutely immune from liability but would not have excused the county from liability. See *Reed v. Village of Shorewood, supra,* 704 F.2d at 953–54.) Failure to take corrective action cannot in and of itself violate section 1983. Otherwise the action of an inferior officer would automatically be attributed up the line to his highest superior and thence to the local government, since the misconduct of policy-making officials (here the members of the Law Enforcement Committee) is attributed to the government. This ladder of liability would be inconsistent with the distinction created by *Monell* between the direct and derivative liability of local government, and with the many lower-court cases that reject the notion that supervisors are strictly liable for their subordinates' violations of section 1983. See, e.g., *Schultz v. Baumgart,* 738 F.2d 231, 238–39 (7th Cir.1984); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983). But the jury did not have to find that the committee merely failed to act. Common-sense recognition that the people who control the purse strings are likely to be consulted about what must have been one of the most dramatic personnel issues

in Burnett County's history, coupled with the facts that the committee had hired Mrs. Soderbeck, had been involved in another disciplinary matter in the sheriff's department (provided it had not been involved in purely a review capacity), met regularly with the sheriff (he testified that he reports to them), and may actually have approved rather than merely have refused to annul the firing of Mrs. Soderbeck, would have allowed a reasonable jury to infer that the committee (Nelson in particular) participated in—at least by ratifying, but in any event not just by passively refusing to intervene in—Kellberg's firing of Mrs. Soderbeck. See *Miller v. City of Mission*, 705 F.2d 368, 375–76 (10th Cir.1983), a factually similar case; *Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir.1980); cf. *Rookard v. Health & Hospitals Corp.*, 710 F.2d 41, 45 (2d Cir.1983).

■ Since Mrs. Soderbeck has a valid judgment for all her compensatory damages against Sheriff Kellberg, and since our refusal to countenance an award of punitive damages against him applies even more strongly to the county and the members of the Law Enforcement Committee, it may seem academic whether she was entitled to a judgment against these other possible joint tortfeasors; you can collect a judgment (for compensatory damages) only once. See, e.g., *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 348, 91 S.Ct. 795, 811, 28 L.Ed.2d 77 (1971). But as is evident from the provision of the Wisconsin constitution quoted earlier, the county will not indemnify the sheriff; nor will the state. See Wis.Stat.Ann. § 895.46, comments (1984–1985 Pocket Part). (All this has been changed since this suit was brought, but without effect on the suit. See *id.*, § 895.46(1)(b).) And the sheriff's bond may have been for as little as $5,000. See Wis.Stat.Ann. § 59.13(1)(c). (Maybe the fact that the jury awarded Mrs. Soderbeck $5,000 in punitive damages against Kellberg is more than coincidence.) Kellberg's bond, whatever it was, plus his private means, whatever they are, may not be enough to pay Mrs. Soderbeck's judgment. So her case against the county and the members of the Law Enforcement Committee is not moot, and we hold that the district judge erred in directing a verdict for the committee's members. And since the county's liability depends critically, as we have seen, on the liability of the members of the Law Enforcement Committee, and the directed verdict prevented the defendants from putting in evidence to rebut the plaintiff's case against the committee, there must be a new trial against all the defendants—except, of course, Kellberg—unless Mrs. Soderbeck is able to collect her judgment in full against him.

■ If a new trial is held, it will be limited to liability. The amount of compensatory damages has been fixed by the jury's verdict against Kellberg and the county, and there is no basis for imposing punitive damages on the members of the committee. True, in most cases applying the principle that allows a new trial to be limited to liability provided there was no error as to damages and the liability and damage issues are logically distinct (as they are here), the same defendant is involved in both determinations. See, e.g., *Dazenko v. James Hunter Machine Co.*, 393 F.2d 287, 291 and n. 7 (7th Cir.1968); *Akermanis v. Sea-Land Service, Inc.*, 688 F.2d 898, 906 (2d Cir.1982); 6A Moore's Federal Practice ¶ 59.06, at p. 59–60 (2d ed. 1984). But the principle ought also to apply when damages are properly assessed against one defendant (or several) and another (who is jointly liable for the same injury to the plaintiff) is incorrectly dismissed from the case. *Gallo v. Crocker*, 321 F.2d 876, 879–80 (5th Cir.1963), so held, noting that Rule 59(a) of the Federal Rules of Civil Procedure allows the granting of a new trial in jury cases "to all or any of the parties and on all or part of the issues." The jury here was asked to determine Mrs. Soderbeck's compensatory damages, and did so. As the number of defendants in a case of joint liability is—as a matter of

legal logic anyway—irrelevant to that determination, she was not prejudiced in a legal sense by having her damages assessed only against two defendants, though conceivably the jury might have been more generous if there had been a third defendant in the picture.

What we have said disposes as well of the last issue in the case, which is whether the district judge should have awarded attorney's fees to the defendants who were dismissed out, that is, the members of the Law Enforcement Committee. Since we hold that these defendants should not have been dismissed from the case, they are not—not yet, anyway—prevailing parties, so they cannot yet be entitled to any award of attorney's fees or costs. But in addition, bearing in mind that an award of attorney's fees to a prevailing defendant in a civil rights case is proper only if the suit can reasonably be described as frivolous, *Hughes v. Rowe,* 449 U.S. 5, 14–15, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980) (per curiam), we think it obvious that these defendants will not be able to obtain attorney's fees, at least for any proceedings to date. Since the plaintiff succeeded in making out a prima facie case against these defendants, that is, a case strong enough to withstand a motion for directed verdict (incorrectly granted by the district judge), the case against them was not frivolous.

To summarize, the award of compensatory damages against defendant Kellberg and the order rescinding the jury's award of punitive damages are affirmed; but the judgments against Burnett County and in favor of the members of its Law Enforcement Committee, along with the award of attorney's fees to those members, are reversed and the case is remanded for further proceedings consistent with this opinion. Costs in this court shall be awarded to the plaintiff, and Circuit Rule 18 shall not apply on remand.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.