Elaine LINDAHL, Milan Grozdanich, and Dusan Grozdanich, Plaintiffs,

v.

Rudy BARTOLOMEI, Lake County Council, Board of Commissioners of the County of Lake and Lake County, Indiana, Defendants.

No. H 84–116.

United States District Court, N.D. Indiana, Hammond Division.

Sept. 16, 1985.

---

Hilbert L. Bradley, Gary, Ind., for plaintiffs.

Ray L. Szarmach, East Chicago, Ind., Gerald M. Bishop, Merrillville, Ind., for Lake County Council.

Edward H. Feldman, Highland, Ind., for Rudy Bartolomei, Bd. of Com'rs of the County of Lake and Lake County, Ind.

Martell B. Royer, Hammond, Ind., for Rudy Bartolomei.

* Of the Seventh Circuit, sitting by designation.

## OPINION

EASTERBROOK, Circuit Judge.*

Rudy Bartolomei was elected Sheriff of Lake County, Indiana, on October 29, 1983. Chris Anton, his predecessor in office, began his term on January 1, 1983, and died on October 9. Anton was elected as the nominee of the Democratic Party, and under state law his position was filled by a vote of the precinct committeemen of the Democratic Party. · Cf. *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982). Bartolomei, then one of the three elected Commissioners of Lake County, ran in this caucus election against Anna Anton, the former sheriff's widow. It was a heated, close race. About 550 precinct committeemen were eligible to vote; Bartolomei won by 10 votes. Many employees of the sheriff's office had campaigned actively for Anna Anton, a fellow employee. Both Bartolomei and Dorothy Gillham, who became his administrative assistant, believed that everyone in the sheriff's office supported the Antons.

Shortly after taking office Bartolomei fired several employees. Three of them filed this suit under 42 U.S.C. § 1983, maintaining that Bartolomei let them go because they had supported his political adversary. See *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). A bench trial was held on August 14 and 15, 1985. This opinion contains the findings and conclusions required by Fed.R.Civ.P. 52(a).

I

Dusan Grozdanich was a friend of Chris Anton's and had served as his bodyguard while Anton campaigned for office. He was also apparently active in East Chicago politics. He had been a prominent supporter of his friend Robert Stiglich, once the Chief of Police in East Chicago, in a campaign for mayor in May 1983 against Robert Pastrick, then (and now) both Mayor of

East Chicago and Chairman of the Democratic Party of Lake County. Pastrick also ran against Chris Anton for sheriff in 1982, and his loss left some hard feelings. Pastrick solicited Dusan Grozdanich's support in that campaign without success.

Chris Anton hired Dusan Grozdanich on June 27, 1983, to be the supervisor of the civil office in East Chicago. The office's principal function is to serve civil process. Dusan Grozdanich supervised one patrolman in the uniformed service and one secretary. (A bailiff sometimes worked with the office but was formally attached to a court.) Anton initially gave Dusan Grozdanich the title and salary of major in the uniformed county police, and he was issued a badge appropriate to that office. But Dusan Grozdanich had not risen through the ranks; he had just retired as a detective of the East Chicago police.

Anton needed and received the approval of the County's Merit Board to make the appointment. At Anton's request, the board had just instituted a rule that allowed the sheriff to appoint anyone of his choice to the position of major, provided the board approved; the former rule had limited the choice to people then holding the rank of captain in the uniformed service, which operated under civil service rules.

Anton's appointment of Dusan Grozdanich produced substantial unhappiness among the sheriff's police. Captain Daryl Longfellow asked the board on behalf of the police union to rescind its approval. The union believed that the position of major should be filled from within the ranks, and that the new rule had been designed to allow the sheriff to reach down (say, to lieutenant or even to corporal, as Bartolomei was to do when naming the next chief of police) rather than to reach outside the department. According to Longfellow, ever since the institution of civil service among police in the 1960s only uniformed police had been appointed to head the civil offices of the department.[1] (Some older outsiders were left in these posts until retirement.) The union also may have been unhappy that Dusan Grozdanich reported directly to Chris Anton rather than through the civil service chain of command.

The board did not alter the rule, but Chris Anton evidently got the message. On September 1 he stripped Dusan Grozdanich of the title, reduced his salary from $24,000 to $17,500, and gave him the title "assistant supervisor." Sheriff Anton did not change Dusan Grozdanich's duties, however, and he stayed on the job until November 21, 1983, when Bartolomei fired him. Bartolomei replaced Dusan Grozdanich with a member of the uniformed police.

Bartolomei did not speak with Dusan Grozdanich about the decision, and Dusan Grozdanich testified that he had no inkling why he was replaced. Peter Katic, recently elected the City Judge of Hammond, shed some light on the subject. Judge Katic is a close friend of the Grozdanich family and grew up with Dusan's son Milan (discussed below). He is also a friend of Bartolomei, and the two have enjoyed substantial political success. Both are members of the Democratic Party, and they have supported each other's bids for office. Shortly after Bartolomei moved from Commissioner to Sheriff, Katic moved from the Indiana House of Representatives to his new position as City Judge. Judge Katic was worried about the future of his friends Dusan and Milan Grozdanich, and on November 18, 1983, he paid a courtesy call on the new sheriff. He inquired about their prospects and Bartolomei replied that things were "very shaky." Bartolomei told Katic that Mayor Pastrick (who had supported him in his bid for office) had told him to "get that man [Dusan Grozdanich] out of the East Chicago office." Judge Katic concluded, based on this remark and Bartolomei's demeanor, that both Grozda-

---

1. There was a controversy about whether Longfellow's testimony is accurate. I find that it is. Since the institution of the civil service system, every head of a satellite office has been (and is today) a civil service officer.

niches "were out." The two exchanged pleasantries and parted as friends.[2]

## II

Milan Grozdanich, Dusan's son, joined the department on January 1, 1983, as a bookkeeper and purchasing agent at the department's headquarters. He made the arrangements for his job with Chris Anton shortly before Anton took office. He purchased supplies for the jail and the office and kept the financial books, including those of the prisoners' trust account. He also audited gun permit receipts. He was sometimes referred to informally as the "office manager," although if such a post existed formally it probably would have gone to the sheriff's administrative assistant. Before joining the department Milan had taken a course in accounting during his three years at Brown University, and he had done some bookkeeping while employed by the county assessor's office. Unlike his father, Milan Grozdanich is not politically active. He supported Chris Anton only by voting for him, and his support of Anna Anton was limited to speaking briefly with one precinct committeeman.

The budget under which the department operates specifies the positions and the salaries attached to each. Like many another line-item budget, this one is only tangentially related to what actually happens within the bureaucracy. The sheriff's administrative assistant, for example, fills a position called "intelligence analyst" by the budget. Milan Grozdanich served in a position labeled "security." There were seven "security" slots when Bartolomei took office; as a result of a change in the budget instituted by Chris Anton, two of these positions were scheduled to be eliminated on January 1, 1984.

When Bartolomei took office on November 1, 1983, four of the seven "security"

slots were held by matrons in the county jail. The jail was operating under a consent decree that required an increase in the number of security personnel, and Sheriff Anton had planned to comply with this (in part) by moving the matrons into the uniformed civil service. All had taken the necessary test and were awaiting the results. The other three "security" jobs were held by an auto repairman in the police garage, by the person in charge of the forensic lab, and by Milan Grozdanich.

Dorothy Gillham, once the Vice-Chairman of the Democratic Party of Lake County, became Bartolomei's administrative assistant ("intelligence analyst" if one believes the job titles) and was charged with recommending who to keep and who to let go. Rudy Bartolomei fired Sophie Geras, Sheriff Anton's administrative assistant, to hire Gillham. She testified that because the department was losing two "security" slots at the end of the year, she had to dismiss two of the people in those jobs. The matrons were kept in order to comply with the consent decree, and of the remaining three "security" slots Gillham recommended that Bartolomei keep the one in the garage. She had been told that auto repair was essential, that uniformed police could take over the crime lab, and that the regular bookkeeper in the department's main office could absorb Milan Grozdanich's duties. So Gillham prepared, and Bartolomei signed, letters discharging both Milan Grozdanich and the head of the crime lab as of the end of 1983. Both received ten days' notice.

If I believed Gillham's account, I would have to find that Milan Grozdanich's politics (or lack of politics) played no role in his dismissal. But I do not believe it. Gillham's account rests almost entirely on a mechanical matching of person to budget line-item that must be unique in the history

---

**2.** Bartolomei admitted that the meeting had occurred but denied making the remark about Mayor Pastrick. Bartolomei denied that he had struck a political deal with Pastrick that cost Dusan Grozdanich his job or even that he had discussed the subject with Pastrick. I believe, however, that Judge Katic accurately described

this meeting. The remark is the sort of thing one remembers about a friend. Judge Katic testified under a subpoena from the plaintiffs and was most distressed about having to do so because his friends were on both sides. He had no reason to lie, and I conclude that he did not.

of the sheriff's office. Gillham herself was in an inappropriate line item. When Dusan Grozdanich was fired, his line item ("assistant supervisor") was repatriated to the main office of the sheriff's department and filled by Dorothy Bartolomei, the new sheriff's wife, who became the supervisor of payroll. In November 1983 Rudy Bartolomei hired a public relations officer, George Van Til; he was paid out of a secretarial line item. Shortly after the turn of the year the four matrons left the "security" lines for positions in the uniformed civil service (as Gillham and Bartolomei must have known was very likely). The department filled these "security" lines after January 1984 with Don Genis, an "employee evaluator;" Walter Rich, an investigator; William Oliver, a maintenance worker, and another employee whose relation to "security" is not obvious.

The department's insistence on tying jobs to line items at the end of 1983 was out of the ordinary. I conclude that Gillham and Bartolomei did this in order to get rid of two people, whose positions then could be filled after January 1 when the matrons vacated the "security" positions. These and other positions ultimately were filled largely (although not entirely) with people who had supported Bartolomei or worked for him in the Commissioners' office.

All the same, there is no evidence that Bartolomei fired either the head of the crime lab or Milan Grozdanich because of politics. He picked these two to let go because they were convenient—because their slots formally disappeared, it was easier to justify their departure. Milan Grozdanich had no politics; he got his job because of the friendship of the Anton and Grozdanich families, not because of politics. The most that can be said is that Milan Grozdanich lost his job because he was his father's son. Bartolomei was unlikely to do the Grozdanich family any favors. Milan Grozdanich was not fired because of his own political views, and I conclude below that it does not matter whether his membership in the Grozdanich family played a role.

## III

Another notice of dismissal came to Elaine Lindahl. She was active in the "Anton Boosters Club," a political organization devoted to the success of Chris Anton. She was its publicity chairman both in 1978 (Anton lost the sheriff's race that year by 300 votes) and in 1982. She organized and attended many campaign affairs; she canvassed many neighborhoods house by house. After Chris Anton died, she campaigned for Anna Anton by wearing buttons, contacting precinct committeemen, and standing in the Lake County office complex shouting "Vote for the Lady" (Anna Anton's campaign slogan) as committeemen arrived for the vote. Dorothy Gillham knew Elaine Lindahl was a member of the Anton Boosters, although she denies knowing that Lindahl was an officeholder. After some hesitation on the stand, Gillham conceded she told Bartolomei that Elaine Lindahl was an Anton Booster.

Sheriff Anton hired Elaine Lindahl on March 14, 1983, to be a warrant clerk in the department's main office. Warrant clerks receive warrants from other sources, record them in the books, and pass them on for service; they also keep track of what happens to the warrants. There were apparently four warrant clerks in the main office, although each was in charge of a different set of warrants. Lindahl's specialty was tax warrants. Lindahl conceded that she had to be trained for the job, and her application for employment lists no obvious qualifications. Lindahl did not graduate from high school; the application for employment implied otherwise. Her only significant prior employment was as a bus driver.

Bartolomei fired Lindahl on November 18, 1983. He did not fill her line item. Both Gillham and Bartolomei testified that Lindahl, junior among the warrant clerks, was let go in order to reduce the budget of the office. After the fiscal 1984 budget had been approved, the state instructed the county to conserve, and this translated to

an 8% reduction in the budget of the sheriff's office, followed by another 5% in 1985. Bartolomei testified without contradiction that the budget reduction process did not affect the number of slots the department possessed on paper, but that he was expected to leave some open and turn unused funds back to the county. In order to do this Bartolomei closed the forensic lab, left six patrolmen's slots unfilled, and grounded the office's helicopters in order to save the costs of fuel. For the 1985 fiscal year Bartolomei left five additional patrolmen's slots unfilled, turned back $20,000 that had been allocated for part-time employment, and lost funding for studies of the department's operation. For both fiscal years, Bartolomei asserted, the vacancy in Elaine Lindahl's job contributed to the savings.

Again this story, if true, would defeat Lindahl's claim. Again I do not believe it. There were 30 or so civilian clerical employees, compared with more than 200 uniformed civil service police. Bartolomei promptly fired at least four of the 30, Anna Anton quit (and others must have); Bartolomei hired eight new civilian employees between November 1, 1983, and February 20, 1984. Some of these hires are unusual. It is not an ordinary incident of an austerity campaign to hire a public relations officer; Sheriff Anton had had none, yet Bartolomei hired one at almost the same time he let Lindahl go. Similarly it is not an ordinary incident of an austerity campaign to hire one's wife to a new position. Anna Anton had just left, and her tasks were reassigned to others in the office. Dusan Grozdanich's line item had just become vacant. Instead of leaving either position open, Bartolomei filled Anna Anton's with a new supervisor of clerks and Dusan Grozdanich's with Bartolomei's wife.

Now nepotism is not a violation of the first amendment. It seems to have been a tradition of the office. (In a wonderful piece of irony, after stopping briefly in a job in the county coroner's office, Anna Anton moved to the job Dorothy Bartolomei vacated in the Commissioners' office.) Bartolomei's hiring practices are pertinent only in the sense that they undercut his explanation for firing Lindahl. Elaine Lindahl showed that Dorothy Gillham and hence Rudy Bartolomei were aware of her activities on behalf of Anna Anton; she was probably the most visible of Anna Anton's supporters in the office; she was fired for reasons of "austerity" while new employees were simultaneously being added to new positions that Sheriff Anton had not thought important to the office. Most of these additions (especially George Van Til and Dorothy Bartolomei) were strong supporters of Rudy Bartolomei. I conclude that had Elaine Lindahl supported Bartolomei for the job—even perhaps had Lindahl been a political cipher—she would not have been let go.

## IV

This is an unusual political firing case because all of the players, members of the Democratic Party, have been political allies. Bartolomei supported Chris Anton's bid for sheriff in both 1978 and 1982. He was a member (although not an active one) of the Anton Boosters. Chris Anton supported Bartolomei. Dorothy Gillham was Vice-Chairman of the Democratic Party and supported both Chris Anton and Bartolomei. At one time or another, Bartolomei hired (or arranged the hiring of) both Chris and Anna Anton when Chris was out of elective office.

But this was not an ordinary campaign. Bartolomei was the victim of redistricting, and his Commissioner's district had been made heavily Republican. Things did not look good for another run for that office, so that the switch to the sheriff's office may have been the only alternative to the end of his political career. Everyone testified that the campaign between Anna Anton and Rudy Bartolomei was hard fought; it was certainly close. Politics may generate hard feelings even within one party, and that seems to have happened here. See *Tomczak v. City of Chicago*, 765 F.2d 633, 640 (7th Cir.1985).

▮ Bartolomei and Gillham testified that they did not take politics into account

in firing the plaintiffs, although with respect to Dusan Grozdanich they make the alternative argument that he was a policy-making employee who could be fired with impunity. They left in place many supporters of Anna Anton—including at least one highly visible supporter, Kay Falk, the civil supervisor in the main office. None of the plaintiffs has any direct evidence (other than the conversation relayed by Judge Katic) that his politics led to his dismissal. Still, I cannot avoid drawing the inference that at least with respect to Dusan Grozdanich and Elaine Lindahl, politics were important. The denials of Rudy Bartolomei and Dorothy Gillham were equivocal in critical places. They could not "recall" seeing people campaign, for example. Dorothy Gillham once said that she "can't say" that there was discussion about firing supporters of Anna Anton but then testified that "on the campaign trail" there had been many discussions about who supported whom. As for Milan Grozdanich, Gillham said, politics did not enter the decision any "more than it enters any other decision." In the sheriff's office, that hypothetical "other decision" likely was political. And the fact that Bartolomei did not fire many supporters of Anna Anton cannot rule the day. Rights under the first amendment are personal, and a political firing need not be part of a purge to be unlawful.

## V

■ The findings I have made require a decision in Lindahl's favor. She was fired because of her support of Anna Anton; under *Elrod* and *Branti*, that is that. I have also found that Bartolomei took Dusan Grozdanich's politics into account. Here, though, this is not enough. The defendants argue that Dusan Grozdanich was a policy-making or confidential employee and that he was removed to restore supervision of the East Chicago office to the uniformed service.

These arguments are not entirely consistent. If the position of supervisor in the East Chicago civil office is indeed regularly a part of the uniformed civil service, to be filled from the ranks of police chosen under a merit program, it is hard to say that the job is a policy-making position within the meaning of *Branti, Tomczak, Grossart v. Dinaso*, 758 F.2d 1221, 1226–27 (7th Cir. 1985), and *Soderbeck v. Burnett County*, 752 F.2d 285 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 2360, 86 L.Ed.2d 261 (1985). Cf. *Horton v. Taylor*, 767 F.2d 471 (8th Cir.1985). *Branti* holds that a position may be filled on political grounds only if political loyalty is relevant to the successful conduct of the duties. 445 U.S. at 518, 100 S.Ct. at 1294. As the Court put it, a football coach may make policy and report directly to political administrators, yet it is hard to see how politics influences the conduct of the job; on the other hand a speechwriter may make no policy, but political loyalty may be essential if the job is to be done properly. The inquiry looks at the tasks of the position, not those of the incumbent in the job (*Tomczak, supra,* 765 F.2d at 641).

The supervisor of the civil office in East Chicago makes no policy. He ensures that process is served. Perhaps he decides which summons to serve first, but he appears to have no other discretion. His is a mundane position, and a good portion of his time seems to have been consumed taking mail back and forth between the main office and the branch in East Chicago. He rates the performance of subordinates, but this is neither policy-making nor political confidence. There is no room for politically "principled disagreement on goals or their implementation." *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). And although Dusan Grozdanich reported directly to Sheriff Anton rather than through the chain of command and may well have given him political advice, this was not a feature of the office; it had to do only with the friendship between Anton and Dusan Grozdanich. I conclude that Dusan Grozdanich occupied a humdrum post that was customarily filled through the civil service and for which political affiliations and beliefs are irrelevant.

Yet this conclusion does not give Dusan Grozdanich the victory he seeks. He was a political appointee in a civil service job. Bartolomei had two reasons for wanting him gone: (a) he was a political enemy (or at least an enemy of Robert Pastrick, a political friend), and (b) he was anathema to the police union. Bartolomei got the sheriff's job by the skin of his teeth. He was serving out Sheriff Anton's term, and he would need to run for his own term in 1986. Even if he did not care whether a former detective of the East Chicago police, rather than a current member of the uniformed sheriff's police, was commanding a patrolman and a secretary in East Chicago, he had a lot of employees who did care.

It is perfectly lawful to put an end to exceptions that aggravate your employees. A sheriff might conclude that promotion of supervisors from within the ranks will improve the morale of the service, and that the prospect of advancement will enable the office to attract better patrolmen. If Sheriff Anton had hired Dusan Grozdanich for reasons of merit unrelated to politics, Bartolomei would have been equally free to tell Dusan Grozdanich to put his skills to work elsewhere—merit or no merit. If Sheriff Anton had hired Dusan Grozdanich in order to "shake up" a civil service he thought indolent, Sheriff Bartolomei could have expelled Dusan Grozdanich on the ground that he no longer wanted things shaken or stirred. If Sheriff Anton thought Dusan Grozdanich better than the best available civil service officer, Sheriff Bartolomei could have disagreed, either on the ground that Dusan was not better or on the ground that a civil service system confines the search for "the best" to those in the lower ranks. The first amendment does not command the institution of a civil service hiring system; when a government adopts a civil service system the constitution certainly does not command the government to tolerate exceptions to the civil service system made by prior occupants of political office. And the successor's power to restore the system should not vanish just because his predecessor went outside the civil service system for political reasons rather than those related to merit or efficiency.

When a politician fires a subordinate for two reasons, one lawful and the other prohibited by the first amendment, the court must determine whether the subordinate would have been fired even without the substantial role politics played. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Cf. *Branti, supra*, 445 U.S. at 520 n. 14, 100 S.Ct. at 1295 n. 14. This is a but-for test. If Dusan Grozdanich would not have been fired but for his politics, he must prevail; if he would have been fired anyway, he loses; and the defendants bear the burden of persuasion. I have not found another case in which a political firing also restored a civil service system, but I see no reason why this approach should not be applied.[3] *Elrod* rejected the argument that a politician who inherits a bureaucracy full of political hacks may make a clean sweep of it on political grounds, and I do not mean to repeat that heresy. It is not "political" at all to restore a previously functioning civil

3. One line of cases, starting with *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), suggests that there should be a "balancing" test. In such an approach, once the plaintiff shows that speech played a role in his dismissal the court balances the harm done to the government by the speech against the employee's interest in free speech. E.g., *Connick v. Myers*, 461 U.S. 138, 150–54, 103 S.Ct. 1684, 1691–94, 75 L.Ed.2d 708 (1983). Several cases have used this approach in cases under *Elrod* and *Branti*, although without explaining why they choose it rather than the *Mt. Healthy* approach. As I read *Pickering* and *Con-* *nick*, however, this balancing test is to be used only when the speech in question is disruptive, and the court must decide whether it is the disruptive portion (permitted) or the strictly communicative portion (prohibited) that accounts for the dismissal. When the question is whether speech caused the dismissal—the question this case poses—the *Mt. Healthy* approach is the one to follow. See *Grossart, supra*, 758 F.2d at 1228 n. 6; *Livas v. Petka*, 711 F.2d 798, 800 (7th Cir.1983); *McClure v. Cywinski*, 686 F.2d 541 (7th Cir.1982); *Nekolny, supra; Wren v. Jones*, 635 F.2d 1277, 1286 (7th Cir.1980).

service system, if you would have done this without regard to the reason why the system had been disrupted to begin with.

The defendants have established that Dusan Grozdanich would have been relieved no matter what. Dorothy Gillham testified that she recommended Dusan Grozdanich's removal·in ·large part because of his anomalous position. Captain (now Major) Longfellow testified that he had brought the union's pressure to bear on the subject. The new sheriff would have needed a very strong reason to keep an outsider in charge of the East Chicago office in the face of a union determined to restore the civil service system. But as it turns out Bartolomei had no reason to want Dusan Grozdanich there. Dusan had *only* politics to support him, and he conceded on the stand that anyone with a background in police work (which includes more than 200 employees of the sheriff's office) could have done the job as well as he. Sheriff Anton was holding back the civil service system single-handedly, and when he died Dusan Grozdanich's removal became inevitable.[4]

Milan Grozdanich also lost his job for two reasons—(a) Bartolomei's desire to have some openings in the office, a desire that made Milan Grozdanich a ready target because he was in the "security" budget line, and (b) because he is his father's son. I cannot say that the defendants have established that Milan Grozdanich would have been fired if (a) were the only strike against him. Bartolomei could have fired the mechanic instead or could have shifted Milan Grozdanich to some other budget line while waiting for the matrons to transfer to the uniformed service.

Just as I could find no precedent for a political firing to restore a civil service system, so I can find little precedent for a firing that is "political" only on account of the employee's family ties.[5] One logical way to think about such a deed is that the firing of the son infringes the rights of the father. In that event Milan Grozdanich is the wrong plaintiff; he cannot vindicate the rights of others, when the others can vindicate their own rights. Even in cases under the first amendment, there must be some "obstacle" to the first party suit before there may be a third party suit.[6] Dusan Grozdanich is of course a plaintiff, but he has not sought recovery for any injury he may have suffered as a result of the firing of his son. I therefore need not decide whether any injury Dusan Grozdanich may have sustained would be cognizable after a court has held that the father's discharge was not itself unconstitutional. (Dusan suffers under the additional handicap that his son's discharge was a dual-motive firing, and his loss, if there was any, may have been the same without regard to the reason his son lost his job.)

Milan could argue that he suffered injury in two ways. The first is that he was penalized for being a political cipher, the second that he was penalized for a family tie that the constitution protects. First things first.

---

4. The plaintiffs have argued that there is a difference between being removed from a position and being fired. Even if Bartolomei was entitled to remove any of the plaintiffs from their jobs, they say, he should have put them in some other job for which they were qualified. This is incorrect. The constitution is not a civil service law. An employee does not have a constitutional right, when fired for lawful reasons, to transfer to some other job or to priority consideration for the next opening. My only task is to determine whether it was lawful for Bartolomei to oust the three plaintiffs from the positions they held when Bartolomei took over.

5. One case that comes close is *Molerio v. FBI,* 749 F.2d 815 (D.C.Cir.1984), in which the plaintiff contended that he had been denied a security clearance because of his father's political activities. The court assumed that this assertion stated a claim for relief but decided the case against the plaintiff on grounds that are irrelevant to Milan Grozdanich's claim. Another is *Wrigley v. Greanias,* No. 82–3109 (S.D.Ill. Dec. 5, 1984), appeal pending, No. 85–1206 (7th Cir.), in which an incoming official fired the defeated official's mother, who had been the former official's secretary.

6. The cases are far from clear. See *FAIC Securities, Inc. v. United States,* 768 F.2d 352, 356–361 (D.C.Cir.1985) (Scalia, J.), for an excellent discussion. See also Henry P. Monaghan, *Third Party Standing,* 84 Colum.L.Rev. 277 (1984).

Suppose Milan Grozdanich were not the passive observer of politics that he is, but were instead a vigorous supporter of Rudy Bartolomei. In that event, the argument would run, he would not have been fired. His loyalty to Bartolomei would have overcome his precarious position in the "security" line, a position that made him especially vulnerable to being released. Any system that puts pressure on an employee to change his political views is unconstitutional, the argument goes, for as *Branti* holds an employee need not yield to pressure in order to have a good case.

This argument is logically impeccable,[7] yet I do not accept it. It proves too much. It cannot coexist with *Mt. Healthy* and the observation in *Branti*, 445 U.S. at 520 n. 14, 100 S.Ct. at 1295 n. 14, that people may be fired for non-political reasons.

Suppose an employee were both a political enemy and incompetent. Under *Branti* the government may fire the employee for the incompetence if the politics were not a strike against him; under *Mt. Healthy* the government may fire the employee even if the politics *were* a strike against him, so long as he was so incompetent that he would have been fired even if he had never opened his mouth. *Mt. Healthy* requires the court to ask if the person would have been fired even if he had remained silent. The employee in either of these situations could argue in reply: "Yes, it's true that I would have been fired for incompetence if I were a cipher, but if I were a strong supporter of the 'ins,' my peccadilloes would have been overlooked. So I really was fired for my political position after all." And this argument is just right in the sense that it identifies a source of pressure that may induce people to change their views. It is not a good legal argument, however, unless a syllogism is all the plaintiff needs to prevail. Cf. *Justices v. Lydon,* 466 U.S. 294, 104 S.Ct. 1805, 1816, 80 L.Ed.2d 311 (1984). This argument requires a court to ask if the discharge would have occurred in light of favorable speech, while *Mt. Healthy* and *Branti* ask if it would have occurred in the absence of speech.

More, the hypothesized source of pressure in this argument is an unconstitutional pressure. The contention that the government might have yielded to the temptation to violate the constitution—to overlook shoddy performance on account of political support—is not a reason why a plaintiff should prevail when the government did no such thing. Thus I conclude that a political neutral in a dual-motive case may not argue that he was under pressure to change his views in order to annul the lawful or speech-neutral motive that contributed to his discharge.

Milan's second argument emphasizes family ties. Under cases such as *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion), family ties are protected by substantive rights. These rights are not absolute (see *Califano v. Jobst,* 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977) (sustaining a rule that imposed a substantial "penalty" on marriage of people receiving disability benefits)), but they impose on the government the need to show a special need before setting families asunder. See *Newborn v. Morrison,* 440 F.Supp. 623, 627 (S.D.Ill. 1977) (state must establish a strong interest to fire a wife on account of her husband's politics). But I do not think these cases help Milan Grozdanich. He is an emancipated child. He does not assert that the sheriff's department penalized him for his family living arrangements. He does not argue that he would have done anything differently if he knew of the possibility that family ties would contribute to his discharge; indeed, on balance family ties seem to have helped Milan get his job. (He now has another job with the county that pays more than his job in the sheriff's department; it is not clear whether ties to

---

7. There is a constitutional right to be a neutral in politics and other speech. See, e.g., *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *Grossart, supra,* 758 F.2d at 1230; *McClure v. Cywinski,* 686 F.2d 541, 544 (7th Cir.1982) (dictum).

the Grozdanich, Anton, or Katic families helped land this job.) Just as a court should be exceptionally reluctant to say that the constitution prohibits nepotism, so it should be exceptionally reluctant to say that it prohibits all discrimination based on family ties. Anti-nepotism rules, for example, are common and would have prevented either Milan's or Dusan's hiring. True, anti-nepotism rules, like the decision to fire Milan, can be said to affect the family. Yet almost any employment decision will have effects on families (firing the breadwinner may break up a family), and it is hard to confine a principle that the government must either ignore or preserve family ties when hiring or firing.

It was mean and petty for Bartolomei to take Milan Grozdanich's family ties into account in deciding to let him go, but the constitution does not prohibit all mean and petty things. Ultimately the effect of retaliation on the speech of either member of the family—the real subject of this case, after all—is too conjectural to say that the government always must disregard such things in making decisions. Milan Grozdanich must turn to state law to protest the sort of action to which he has been subjected. There are too many relatives of too many people in government, each with some ties to the others, to be comfortable about launching the federal courts into the business of determining whether acts against one have affected the speech (or association) of the others. Cf. *O'Bannon v. Town Court Nursing Home*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (the due process clause does not require tracing the reverberations of governmental actions through the many levels that may be affected by each action and offering a hearing to all those affected). Because many public employees learn of or obtain access to jobs through their relatives, it would be especially difficult to cabin a right of action based on supposed hostility toward these relatives. The danger to constitutional rights from retaliation seems small, the difficulties of pursuing a right of action great.

## VI

■ Elaine Lindahl is entitled to damages for the income she lost as a result of her discharge. Although the complaint also seeks compensatory damages for emotional loss, Lindahl did not prove any emotional injury. She is also not entitled to punitive damages; the case is too close for a punitive award, see *Soderbeck, supra.* Counsel for the parties should discuss the appropriate computation and present this together with the other matters set out below.

Lindahl also sought reinstatement to her former job. Although the plurality opinion in *Elrod, supra*, 427 U.S. at 373–74, 96 S.Ct. at 2689–90, states that any deprivation of rights under the first amendment is "irreparable" and so authorizes injunctive relief, another recent decision holds that courts ought not to order governmental employees reinstated as a matter of course. *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). A reinstated employee may disrupt the operation of the office, especially a small office, and people who rely on the government's services (unlike those who buy goods and services in the private market) cannot easily turn elsewhere for their needs if the quality of work in the sheriff's office deteriorates. An award of damages cannot undo the harm to speech—but then neither can reinstatement. The promise of adequate damages, however, like the promise of reinstatement, removes the anticipated effect on speech that gives rise to the problem. An employee may speak vigorously if he knows that he will not lose income, and this should be as effective as injunctive relief in preventing future injury to constitutional rights.

I therefore think it appropriate to offer the defendants a choice between reinstating Lindahl to her position as a warrant clerk or some equivalent position, or paying a lump sum in lieu of future wages (sometimes called "front pay"). See *EEOC v. Prudential Federal Savings & Loan Ass'n*, 741 F.2d 1225, 1230–33 (10th Cir. 1984) (collecting cases). An award of five

years' front pay should be more than sufficient to compensate Lindahl for monetary loss she might suffer from continued unemployment. The value of five years' pay at $12,374 per year is $58,325.35 if discounted to present value at the real interest rate of 2% per year.[8] Because Lindahl is not unemployed, five years' front pay at her full salary actually compensates for more than five years' lost wages. The payment should be in one lump sum with no deduction for actual income; the lump sum nature of the payment preserves Lindahl's incentive to seek out the best employment she can find, an incentive that would be lost were the front pay made contingent on her actual success in finding employment.

The payment of this sum is not required. It is simply an alternative that both ensures Lindahl's income (either through reemployment or damages) and preserves the government's option to keep its existing staff in place. The defendants shall choose which option they prefer when they make the filings discussed below.

■ By "the defendants" I mean the three governmental bodies. The suit against Bartolomei evidently is in his official capacity, so that he is not personally liable for the damages. See *Kentucky v. Graham*, —— U.S. ——, 105 S.Ct. 3099, 3105–07, 87 L.Ed.2d 114 (1985). Bartolomei was the author of the "policy" of the sheriff's office, however, so that it is responsible under § 1983 for his acts. *City of Oklahoma City v. Tuttle*, —— U.S. ——, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). The office has no separate corporate existence, and the three corporate defendants (the county council, the county board of commissioners, and the county itself) have proceeded as if they will pay any judgment. It is now too late for them to change their minds.

Because Lindahl is a prevailing party, her lawyer (who represented all three plaintiffs) is entitled to an award of fees. I withhold entry of judgment on the merits to avoid the unfortunate jurisdictional problems that sometimes follow multiple judgments in a single case. See *Exchange National Bank v. Daniels*, 763 F.2d 286 (7th Cir.1985). Under *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), counsel has prevailed in part and is entitled to the fees reasonably necessary to produce a victory for Lindahl only.

Counsel for the parties should discuss fees and the other matters mentioned above. If they can reach an agreement on these issues, they should file a joint statement within 21 days. If not, within 21 days counsel for Lindahl should submit a statement demonstrating what fees would have been incurred if Lindahl had been the only plaintiff in the case. (Presumably this is more than one-third of the total, because counsel would have had to do many of the same things he did, even if Lindahl alone were the plaintiff.) This submission also should set out a computation of damages for the period between November 21, 1983, and the date of judgment. Counsel for the defendants then have 10 days to respond to this statement and to elect between reinstatement and front pay. Both sides should include in these submissions any materials they ordinarily would include in a motion to alter or amend the judgment under Rule 59(e). I hope it will be possible to enter a final judgment after this exchange of papers; if it is not, I will set a date for a hearing on fees and any remaining factual issues.

---

**8.** Under the methodology discussed in *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 538–47, 103 S.Ct. 2541, 2551–56, 76 L.Ed.2d 768 (1983), and *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1199–1201 (7th Cir.1982), discounting using the historical real rate, while disregarding inflation, is appropriate.