GENERAL FOAM FABRICATORS, INC.,
Plaintiff-Counterdefendant-Appellant,

v.

TENNECO CHEMICALS, INC.,
Defendant-Counterplaintiff-Appellee,

v.

Warren LEVINS, et al.,
Counterdefendants-Appellants.

No. 82–1491.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 17, 1982.

Decided Dec. 8, 1982.

Rehearing Denied Jan. 26, 1983.

Daniel C. Meenan, Jr., Fiewell, Galper & Lasky, Chicago, Ill., for plaintiff-counterdefendant-appellant.

Lawrence P. Bemis, Chicago, Ill., for defendant-counterplaintiff-appellee.

Before POSNER and COFFEY, Circuit Judges, and CAMPBELL,* Senior District Judge.

COFFEY, Circuit Judge.

This is an appeal from the district court's order granting the defendant's motion for a judgment notwithstanding the verdict. The plaintiff-appellant, General Foam Fabricators, Inc., sued the defendant-appellee, Tenneco Chemicals, Inc., for breach of an alleged oral confidentiality agreement between General Foam and the International Foam Division of Holiday Inns, Inc., a corporation subsequently acquired by the defendant. It was reported that the oral confidentiality agreement provided that International Foam would not disclose or use in the conduct of its foam business any internal information gained from General Foam regarding customer orders, correspondence files, production records, etc. At the end of the trial, the jury returned a verdict and judgment was entered in favor of the plaintiff in the amount of $183,468.74. Some year and three months thereafter, the Honorable James B. Moran, the trial judge, denied the the defendant Tenneco's motion for judgment notwithstanding the verdict, but did grant the defendant's alternative motion for a new trial. Three months later, the court reversed its prior rulings, and not only granted the defendant's motion to reconsider, but also granted the defendant's motion for judgment notwithstanding the verdict, a motion the court had denied just ninety days earlier, and further included a caveat granting the defendant a new trial in the event the judgment n.o.v. was reversed. Reverse and remand.

General Foam Fabricators, Inc. buys bulk polyurethane foam from various suppliers and cuts this foam into the shapes specified by its furniture and bedding manufacturing customers. In July, 1974 Warren Levins and Samuel Ekstein, the principal officers and the sole shareholders of General Foam, began buying bulk foam from the International Foam Division of Holiday Inns, Inc. Along with their purchase of cut foam, later that year Levins and Ekstein established a small line of credit for General Foam with International. Some months later, seeking to increase General Foam's business volume, Ekstein and Levins requested an increased line of credit from Vito Piccirillo, the sales representative for International Foam, who in turn relayed this request to his superior, Pitt Harris, the general manager of International Foam. According to Piccirillo, Harris was reluctant to increase General Foam's line of credit without examining the company's records. Thereafter, in order to satisfy himself that General Foam was a good credit risk, Harris met with Piccirillo, Levins and Ekstein at General Foam's offices. The parties to this lawsuit allegedly entered into the oral confidentiality agreement at this meeting.

Ekstein and Levins testified at trial, that Harris stated he wished to examine General Foam's books, records and files in order to "satisfy ourselves that you really know how to run a business. . . . So we have to get into the inside of your business to know and satisfy ourselves whether or not you can make a profit." Ekstein and Levins testified that they expressed grave reluctance and concern over showing representatives of International Foam this type of information, stating "You are asking us to tell you all about our company and if we tell you that information, you can, whenever you want, turn around and use that information against us." Both Ekstein and Levins reported that Harris and Piccirillo agreed they would never let anyone see the infor-

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

mation they had obtained from General Foam and that such information would be considered private and confidential. Indeed, Piccirillo is alleged to have stated "I take an oath on my kids. I swear I'll never hurt you."

Piccirillo, on the other hand, at trial related a somewhat different account of the events which took place at that meeting, testifying that he did not recall having examined any books or records of General Foam, in fact none were produced during that first meeting. In contrast to the testimony of Ekstein and Levins, it was Piccirillo's impression that the meeting was concluded when Harris told Ekstein and Levins that despite his having not looked at the books or records, he would do everything he could to increase their line of credit.

Several weeks later, a second meeting was held in General Foam's office to discuss the requested increase in General Foam's line of credit, and at the suggestion of Harris and Piccirillo, Ned Mukhar International's comptroller was also in attendance. Levins and Ekstein testified that again they expressed their sincere misgivings about sharing "confidential information" with a potential competitor, and further reported that Mukhar stated the information gained from General Foam's books and records would never be used for sales purposes by International Foam. Ekstein and Levins also testified that after he gave this promise, Mukhar made a thorough examination of the same material earlier shown to Harris and Piccirillo, including but not limited to General Foam's customer lists, correspondence files, information relating to book costs, production records, and packaging procedures. Mukhar, when testifying, contradicted this testimony and stated that the only information or documents he requested from General Foam were their financial statements in order to determine whether they (General Foam) were a good credit risk. Mukhar further stated that he did not examine any papers, documents, books or records during this meeting, nor was he ever privy to any information concerning General Foam's customers, customer lists, methods of manufacture, etc.

After the alleged investigation of General Foam's books, records, etc., International increased General Foam's line of credit to $40,000.[1] Using this line of credit, General Foam increased the volume of its business with International. Ekstein testified that during this period he continued to divulge confidential information to International through Mukhar and that Mukhar again reportedly stated "I will never tell anybody. I'm only interested in looking at your books and records to satisfy myself from a credit standpoint. You have my word I will never use the information against you." In 1975, at General Foam's request International Foam again increased General Foam's line of credit from $40,000 to $100,000, but shortly thereafter International increased its prices for bulk foam, forcing General Foam to cease doing business with International.

On March 1, 1976 Tenneco Chemicals, Inc., the defendant-appellee herein, acquired the International Foam Division of Holiday Inns. Shortly after Tenneco's acquisition of International Foam, Piccirillo, who remained with Tenneco after the transition and who had now been promoted to sales manager of Tenneco's Chicago Division, contacted Levins and Ekstein at General Foam and reassured them that "nothing drastically was going to change in our working relationship." Thereafter, Ekstein and Levins met with representatives of Tenneco in an attempt to work out a revised pricing agreement acceptable to all parties. The parties' latest working relationship lasted for approximately two months, but because of another round of price increases by Tenneco, General Foam again discontinued its business dealings with Tenneco.

Ekstein testified that on May 19, 1976 a luncheon meeting was held to discuss the

1. The record indicates the increase in credit was also based upon personal guarantees signed by Ekstein. Levins and their wives.

problems between the two companies, with Ekstein and Levins representing General Foam and Piccirillo and Mersch [2] representing Tenneco and that before sitting down to lunch Mersch stated:

> "Before we sit down, I've got to tell you something. I've got to give you a 12½ percent price increase across the board and get 80 percent of your business or I have been given instructions to use everything that I have in my files to go directly to your customers and take your accounts away from you."

Ekstein immediately canceled all orders General Foam had placed with Tenneco. In response to a plea by Frank Lowell, a Tenneco vice president, General Foam again placed an order at the higher price to "try to keep the relationship between us going." However, because Tenneco failed to deliver the bulk foam on the prescribed date, General Foam discontinued the business relationship with Tenneco.

In August of 1976, Mersch and Piccirillo called on one of General Foam's major accounts, Douglas Furniture, and asked for an opportunity to "quote a price" because "we [are] going after business . . . in general." After receiving patterns and blueprints and specifications to aid in the preparation of price quotations for cut foam, Mersch and Piccirillo formulated a quotation. The quotation was submitted to a buyer at Douglas, but was rejected as being too high. After this initial rejection, Piccirillo was forced to revise the original quotation downward in order to sell Douglas the cut foam. Tenneco next made a "low ball quote" to Joaine Fabino, the buyer for another of General Foam's major accounts, Brody Seating Company. Ms. Fabino rejected Tenneco's "low ball" price quotation [3] but, after some reflection changed her mind and eventually did buy cut foam from Tenneco based on this quotation.

After learning that Tenneco was actively soliciting orders for cut foam from their customers, and believing that Tenneco was using confidential information to undercut General Foam's prices, General Foam brought this action on November 2, 1976, charging that Tenneco was using internal information in breach of the confidentiality agreement to compete with General Foam. At trial, it was General Foam's position that International Foam insisted that General Foam, as a condition precedent to the extension of credit, make available to International Foam their ledgers, books and records of accounts, customer lists and other financial records. In turn International allegedly agreed that "it would neither disclose nor utilize such information in the conduct of its business." General Foam further alleged that International Foam had been acquired by Tenneco Chemicals, Inc., and thus they (Tenneco) were likewise bound by the terms of the prior confidentiality agreement. General Foam charged that thereafter Tenneco (the successor to International Foam) used the confidential information supplied to International Foam in order to acquire General Foam's customers and thus breached the oral confidentiality agreement.

After an exhaustive discovery process which caused substantial delay, the case went to trial on September 9, 1980. At the end of the plaintiff General Foam's case, Tenneco's motion for a directed verdict was denied. At the close of trial the jury rendered a verdict for General Foam in the amount of $183,468.74, and judgment was entered on the verdict on September 22, 1980. One week later, Tenneco filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. Some fifteen months later, on December 7, 1981, the district court issued the following order which reads, in pertinent part:

> "Long pending before this court has been defendant's motion for judgment

---

**2.** Mr. Ed Mersch was Tenneco's regional sales manager.

**3.** Ms. Fabino testified that a "low ball" quote was one where a seller initially quoted a very low price in order to attract the buyer's busi-

ness. After inducing the buyer to change distributors, the seller then would steadily raise his prices until they were commensurate with current market prices.

not withstanding the verdict or, in the alternative, for a new trial. The very troublesome question has not been whether, but which. *This court concludes that defendant is not entitled to judgment NOV, [sic] but is entitled to a new trial.*

Because this case has been this court's only experience to date in which I have found a jury verdict to be wholly surprising, I have reviewed the entire transcript and many of the exhibits. I have done so with considerable caution because this court's view of the credibility of certain of the testimony was different from that of the jury and the jury's credibility judgments are unquestionably conclusive. On the basis of that review the court believes that there was sufficient evidence supporting a claim to go to a jury but that the verdict was against the clear weight of the evidence and was excessive, and it resulted in a miscarriage of justice.

Plaintiff's evidence was sufficient to sustain the conclusion that there was a confidentiality agreement. The leap from there to a determination that defendant misused confidential information in the later part of 1976 is, however, considerable. What 'inside' information was then useful to defendant and then known to defendant the evidence left amorphous.

    *      *      *      *      *      *

This court is persuaded that the verdict was not based upon the probative evidence and the instructions but upon the jury's conclusion that, despite the antitrust laws, it was unfair that plaintiff should have to cope with competition from its former supplier. Such a verdict cannot stand. The motion for a new trial is granted." (emphasis added).

Thereafter, the plaintiff filed a motion to allow permission to appeal, and the defendant filed a counter motion to reconsider the denial of the judgment n.o.v. On February 12, 1982, without making any findings of fact or conclusions of law, the court reversed its written order entered some ninety days earlier and granted the defendant Tenneco's motion for judgment n.o.v. The February 12th order reads as follows:

"The Court denies plaintiff's motion to allow petition for permission to appeal on the ground that the granting of a motion for a new trial is not appealable. The court grants defendant's motion to reconsider and, upon reconsideration, grants defendant's motion for judgment notwithstanding the verdict. The court also determines that if the judgment is hereafter vacated or reversed the motion for a new trial is granted for the reasons stated in the Memorandum and Order of December 7, 1981."

It is from this final order that the plaintiff has appealed.

## ISSUES PRESENTED

1. Was the district court in error in entering a summary order granting the defendant's motion for judgment notwithstanding the verdict, where the order contained no specific findings of fact or conclusions of law, after the trial court had previously denied the defendant's like motion for a judgment notwithstanding the verdict?

2. Did the district court err in granting the defendant a new trial?

### 1. *Judgment n.o.v.*

■ A motion for judgment notwithstanding the verdict raises only a question of law, and not a mixed question of law and fact. *Marsh v. Illinois Central R.R.,* 175 F.2d 498 (5th Cir.1949). Therefore, when ruling on a motion for judgment n.o.v. the trial judge does not exercise discretion but makes a ruling as a matter of law. It is well established that "[i]n this circuit in diversity cases the state law standard for a judgment n.o.v. is applied." *Oberman v. Dunn & Bradstreet, Inc.,* 507 F.2d 349, 352 (7th Cir.1974). Since this diversity case was venued in Illinois, the Illinois standard governing the grant of a judgment n.o.v. applies. The Illinois standard for the grant of a judgment n.o.v. is clearly set forth in *Pedrick v. Peoria and E.R.R.,* 37 Ill.2d 494, 229 N.E.2d 504 (1967):

"In our judgment verdicts ought to be directed and judgments n.o.v. entered

only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

337 Ill.2d at 510, 229 N.E.2d at 513.

■ Despite the very strong language concerning a judgment n.o.v. in *Pedrick* that the evidence must "so overwhelmingly favor [Tenneco] that no contrary verdict based on that evidence could ever stand," we are unable to determine whether the district court applied the strict Illinois standard because of the failure of the trial judge to make specific findings of fact or conclusions of law when he granted the motion for judgment notwithstanding the verdict. Where, as herein, a trial judge has reversed himself and failed to make specific findings of fact or conclusions of law in support of his reversal, we cannot defer to the judgment or reasoning of the trial judge and thus, we are constrained to conduct an independent review of the record to determine whether "the evidence, when viewed in its aspect most favorable to [the plaintiff, General Foam] so overwhelmingly favors [the defendant, Tenneco] that no contrary verdict based on that evidence could ever stand." *Pedrick*, 37 Ill.2d at 510, 229 N.E.2d 504.

In order to recover for a breach of the alleged confidentiality agreement, it was incumbent upon General Foam to establish that such a confidentiality agreement was in fact in existence at the time of the purchase of International Foam by Tenneco. The district court's initial order expressly found that General Foam had introduced sufficient evidence to raise a jury question on the issue of the existence of the confidentiality agreement. While the judge reversed this previous conclusion, we can only speculate on his reasoning as he likewise failed to analyze or discuss this issue in his final order. Our review of the transcript reveals that Levins and Ekstein each testified that when Piccirillo and Harris of International Foam asked to investigate the books and records of General Foam, both

Ekstein and Levins expressed grave reluctance and concern over the release of confidential information such as books, records, customer lists, production costs, etc., to International Foam, a potential competitor. Ekstein and Levins further testified that both Harris and Piccirillo, on behalf of International Foam, promised that any information which was given to them by General Foam would be held in the strictest of confidence. In fact, Piccirillo was alleged to have stated "I take an oath on my kids. I swear I'll never hurt you." Thereafter, it is interesting to note that Harris and Piccirillo brought in Ned Mukhar, International's comptroller, to take a more detailed look at General Foam's books, records, customer lists, etc. Mukhar, International Foam's top financial officer, also allegedly promised to keep this information confidential. Both Levins and Ekstein testified that after receiving these promises of confidentiality, they bared their souls and on occasions opened General Foam's books, correspondence files, production records, packing procedures, etc., to Harris and Piccirillo, and ultimately to Mukhar.

■ It was noted in the statement of facts that both Piccirillo and Mukhar when testifying at trial recited that no promise of confidentiality was ever given to either Ekstein or Levins, and further, that no confidential information ever passed from General Foam to either International Foam or Tenneco. However, the mere denial of the existence of the alleged confidentiality agreement which is the heart of this lawsuit does not alone justify the grant of a judgment n.o.v., because this is not a question of law but one of credibility and it is for the jury to determine the credibility of these witnesses and in doing so to decide whether a confidentiality agreement was ever in existence and if so, did any confidential information ever flow from General Foam to International Foam or Tenneco. Clearly, when evidence is presented on both sides of an issue so that "reasonable men in a fair and impartial exercise of their judgment may reach different conclusions," *Valdes v. Karoll's Inc.*, 277 F.2d 637, 638 (7th Cir.

1960), "we cannot say that the evidence only supports one reasonable conclusion," *Oberman,* 507 F.2d at 353, and a judgment n.o.v. should not be entered. Indeed, the District Court judge stated in his initial and only finding of fact that he had examined the record and the exhibits for fifteen months and reached the conclusion that there was sufficient evidence of a confidentiality agreement to raise a jury question. While the judge reversed this same finding some three months later, he failed to support his reversal with specific findings of fact or conclusions of law. Because we hold sufficient testimony was presented concerning the existence and/or nonexistence of the confidentiality agreement so that reasonable men could differ as to whether or not the agreement existed, we hold the question was one for a jury to decide and thus the grant of a judgment n.o.v. was inappropriate.

■ We now address the issue of whether General Foam presented sufficient evidence to raise a jury question as to whether Tenneco assumed International Foam's obligations under the alleged confidentiality agreement between General Foam and International when it purchased International Foam. The test of whether an acquiring corporation assumes the obligations, including a confidentiality agreement, of the acquired company is set forth in *Forest Laboratories, Inc. v. Pillsbury Co.,* 452 F.2d 621 (7th Cir.1971), where this court stated:

"a corporation which purchases the assets of another corporation does not, by reason of succeeding to the ownership of property, assume the obligations of the transferor corporation.... Exceptions to this rule exists where (a) the purchasing corporation expressly or impliedly agrees to assume the liabilities of the seller, (b) the transaction amounts to a consolidation or merger of the two companies, (c) the purchasing corporation is merely a continuation of the selling corporation, or (d) the transaction is entered into fraudulently to escape liability."

452 F.2d at 625 (citations omitted).

Our review of the record reveals that the conflicting evidence introduced at trial was more than sufficient to raise a jury question on the issue of whether Tenneco "expressly or impliedly agreed to assume" International Foam's obligations under the alleged confidentiality agreement. Ekstein and Levins testified that after the merger between International Foam and Tenneco both Piccirillo and Mukhar continued in the employ of Tenneco and that Piccirillo was reported to have reaffirmed and recited for a second time that the alleged confidentiality agreement previously entered into was still in force, stating, "Look, nothing is changing. Everything is going to be the same. Don't be concerned about it." Clearly, at the very least, the continued employment of Mukhar and Piccirillo in upper management positions and Piccirillo's reaffirmation of the alleged confidentiality agreement meet the test of raising "inferences ... such that reasonable men in a fair and impartial exercise of their judgment may reach different conclusions," *Valdes,* 277 F.2d at 638, and thus gives rise to a jury question as to whether Tenneco expressly or impliedly agreed to assume International Foam's obligations under the confidentiality agreement. In a case such as this, where reasonable men might differ as to the assumption of the obligations by the transferor (Tenneco), we hold that the trial judge was in error when he reversed himself without stating his legal reasoning and granted a judgment n.o.v. because the question is one of the credibility of witnesses, a question for the jury and not one to be decided as a matter of law.

■ Finally, in analyzing the propriety of the trial court's ruling on the defendant's motion for judgment notwithstanding the verdict, we must analyze whether General Foam presented sufficient evidence to raise a jury question as to whether Tenneco breached the alleged confidentiality agreement and if that breach caused and resulted in injury and/or damages to General Foam. On the issues of breach and causation, General Foam presented the testimony of Ms. Fabino of Brody Seating that a salesman from Tenneco "quoted prices" to her based

on specifications she believed had not been supplied to Tenneco by Brody Seating. The defendant denies the accuracy of Fabino's testimony and further notes that upon cross-examination Fabino revealed that she later learned another employee of Brody Seating might have supplied the patterns from which Tenneco's price quotations were developed. This conflict in testimony at the very least raises a jury question as to the credibility of the witness, a question that must not be decided by the trial court as a matter of law. *Kudelka v. American Hoist & Derrick Co.,* 541 F.2d 651, 654 (7th Cir. 1976).

In light of the fact that General Foam presented sufficient evidence from which reasonable men could differ on the issues of (1) whether a confidentiality agreement existed between General Foam and International Foam; (2) whether Tenneco through their upper management personnel (Piccirillo and Mukhar) agreed to assume the obligations under the confidentiality agreement; (3) whether Tenneco later breached this confidentiality agreement, if one in fact existed; and (4) if the jury does find that Tenneco breached the confidentiality agreement, whether this breach resulted in harm to General Foam and what damages flowed therefrom, applying the Illinois test of *Pedrick v. Peoria E.R.R.,* we hold that the evidence was not so overwhelmingly and convincingly in favor of Tenneco that no verdict for General Foam could ever stand and therefore the district court's ruling granting Tenneco's motion for judgment notwithstanding the verdict is reversed.

### 2. New Trial

In the court's original order of December 7, 1981 the district court concluded that the defendant was entitled to a new trial. Thereafter, the court reconsidered this order, reversed itself and granted the defendant's motion for judgment notwithstanding the verdict. However, at this time the court also stated that "if the judgment is hereinafter vacated or reversed the motion for a new trial is granted for the reasons stated in the Memorandum and Order of December 7, 1981," thus protecting the defendant either way. Since we have reversed the trial judge on the issue of the defendant's motion for judgment notwithstanding the verdict, we will now address the question of whether the district judge was correct in granting the defendant a new trial in the event of reversal.

Unlike a judgment n.o.v., a judgment made by the court as a matter of law and therefore governed by state law, the grant or denial of a new trial is discretionary and is a matter of federal procedure not governed by state law or practice. *Youdan v. Majestic Hotel Mgmt. Corp.,* 125 F.2d 15, 17 (7th Cir.1942). *See also* 11 Wright and Miller *Federal Practice and Procedure* § 2802. The test to be applied in determining whether a motion for a new trial should be granted is whether "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940). The district court correctly applied this standard and granted the defendant a new trial when it stated:

> "the court believes that there was sufficient evidence supporting a claim to go to a jury but ... the verdict was against the clear weight of the evidence and was excessive, and it resulted in a miscarriage of justice."

Because "[t]he authority to grant a new trial ... is confided almost entirely to the exercise of discretion on the part of the trial court," *Allied Chemical Corp. v. Daiflon,* 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980), the grant or denial of a motion for a new trial "is not subject to review by this court, except upon exceptional circumstances showing a clear abuse of discretion." *Stinebower v. Scala,* 331 F.2d 366, 367 (7th Cir.1964). Having reviewed the record and the district court order granting the defendant a new trial, we hold that the district court applied the proper legal standard and we further agree with the trial court on this issue alone and hold

that only that portion of the trial court's order granting the defendant's motion for a new trial is affirmed. The cause is remanded for a new trial consistent with this opinion before another district judge. *See* Circuit Court Rule 18.