**Gerald CYGNAR, et al., Plaintiffs,**

v.

**CITY OF CHICAGO, et al., Defendants.**

**No. 85 C 5902.**

United States District Court, N.D. Illinois, E.D.

Dec. 30, 1986.

John Gubbins, Chicago, Ill., for plaintiffs.

Jonathan Siner, Arthur Christie, Asst. Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

City of Chicago ("City") and former Executive Director Raleigh Mathis ("Mathis") of the Office of Municipal Investigation

("OMI") have brought post-trial motions under Fed.R.Civ.P. ("Rules") 49(b), 50(b) and 59(e). They seek alternatively to set aside the judgment, to enter judgment in their favor notwithstanding the verdict, to obtain a new trial or to reduce damages, in each instance seeking to upset the aggregate $4.29 million judgment awarded under 42 U.S.C. § 1983 ("Section 1983") to 13 white Chicago police officers transferred out of OMI. For the reasons stated in this memorandum opinion and order, defendants' motions are granted in part and denied in part, while final ruling must be deferred in part.

Despite some really substantial disparities in proof among the plaintiffs, the jury's verdict for each was identical: $55,-000 in compensatory and $275,000 in punitive damages (the latter against Mathis alone), in each instance 10% more than plaintiffs' lawyer had asked.[1] And as to each plaintiff—including those who had engaged in no overt political activity at all and as to whom there was no evidence whatsoever that Mathis could have known of the plaintiff's political preferences—the jury answered "yes" to each of two special interrogatories:

1. Was Raleigh Mathis' decision to reassign any of the following plaintiffs out of the Office of Municipal Investigations substantially motivated by the political affiliations of that plaintiff?

2. Was Raleigh Mathis' decision to reassign any of the following plaintiffs out of the Office of Municipal Investiga-

tions substantially motivated by the race of that plaintiff?

As to each plaintiff, the jury answered "no" to a third special interrogatory:

3. If you have found either the political affiliation or race, or both, of any plaintiff was or were a substantially motivating factor or factors in Raleigh Mathis' decision to reassign that plaintiff, would Raleigh Mathis have reached the same decision to reassign that plaintiff even in the absence of that plaintiff's political affiliation and even without reference to that plaintiff's race?

Finally the jury answered "yes" to the fourth interrogatory—again as to each plaintiff:

4. Do you find that Raleigh Mathis' decision to reassign plaintiff out of O.M.I., to the extent it was substantially motivated by the intent to discriminate against plaintiff because of his race, was perceived by Mathis as a means to correct what he considered a previously-existing racial imbalance within O.M.I.?

*Standards of Review*

Very different standards apply to judgments notwithstanding the verdict and new trials. *Van Houdnos v. Evans*, 807 F.2d 648, 650 (7th Cir.1986) marks merely the most recent, rather than any new, expression of the former set of criteria:

By directing verdicts for defendants, the district judge necessarily found that plaintiff had not produced enough evidence about those events, even when

---

**1.** Both the jury instructions (worked out with care during a conference with counsel for both sides) and the special interrogatories and verdict forms were meticulous in underscoring the individual nature of plaintiffs' claims—and the need for the jury to consider them separately. Yet the closing argument by plaintiffs' counsel made no effort to distinguish among them in terms of proved damages (or, indeed, in terms of liability). In a sense, that points up the potential conflict of interest inherent in a single lawyer's representation of multiple parties (whether plaintiffs or defendants) who stand in factually different circumstances: Inevitably an argument that one client should (for example) get a higher award because of special factors may be viewed as depreciating another client's

situation. Whatever the validity of such concerns, or whatever the reasons that plaintiffs' counsel (and to a somewhat lesser extent defendants' counsel) treated plaintiffs as fungible for jury purposes, the later discussion in this opinion reflects the impact of the verdict's lack of responsiveness to major individual differences among the plaintiffs. One last point should be made here in view of the several references to plaintiffs' counsel in this footnote and elsewhere in this opinion: Nothing said here should be misunderstood as an adverse reflection on the professionalism of plaintiffs' counsel, who did a first-rate job of trial lawyering (as well as, obviously, a highly persuasive one) for his clients.

viewed in the light most favorable to plaintiff's position, to allow the jury to make a reasonable finding in plaintiff's favor. That is the standard by which directed verdicts and judgments notwithstanding jury verdicts are judged. The district judge must determine "whether the evidence presented, combined with all the reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in a light most favorable to the party against whom the motion is directed." *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1213 (7th Cir.1985); *Benson v. Allphin*, 786 F.2d 268, 279 (7th Cir.) ("The standard for granting a directed verdict is very generous to the nonmovant."), *cert. denied*, —— U.S. ——, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). The district judge is not permitted to resolve conflicts in the testimony or weigh and evaluate the evidence. These functions are reserved for the jury. *See, e.g., Continental Casualty Co. v. Howard*, 775 F.2d 876, 879 (7th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986). Nevertheless, the district judge must determine whether "the evidence, taken as a whole, provides a sufficient probative basis upon which a jury could reasonably reach a verdict, without 'speculation over legally unfounded claims.'" *Panter v. Marshall Field & Co.*, 646 F.2d 271, 281 (7th Cir.) (quoting *Brady v. Southern Railway*, 320 U.S. 476, 480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943)), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). As the Supreme Court recognized long ago:

> A mere scintilla of evidence is not enough to require the submission of an issue to the jury. The decisions establish a more reasonable rule "that in every case, before the evidence is left in the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."

*Gunning v. Cooley*, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720 (1930) (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1871) (footnote omitted)); *Hohmann v. Packard Instrument Co.*, 471 F.2d 815, 819 (7th Cir.1973).

This District Court's former Chief Judge William Campbell, sitting by designation and concurring in *Van Houdnos, id.* at 657 took the occasion to add:

> I am in full agreement with the opinion. I write merely to echo my concern, so aptly expressed by one of my colleagues, that juries in § 1983 cases are becoming like law clerks, handing their recommendations to the judge who then does as he sees fit. As a district judge since 1940, I have great confidence in the jury system. I am alarmed by what I sense to be an increased prevalence of directed verdicts against prevailing plaintiffs in § 1983 actions. In my opinion, this case represents a less-known but equally dangerous brand of "judicial activism," and our reversal here should serve as a warning or lesson concerning the precariousness of such activism.

█ Motions for new trials involve a less demanding standard. Judge Campbell's predecessor as Chief Judge of our District Court, Honorable John Barnes, was wont to refer to himself as sitting as the "thirteenth juror."[2] To the extent that implies substitution of the judge's view for those of the jury, it is of course not an accurate description of the process. Instead the court, in acting on a new-trial motion, is called on to determine whether the verdict is against the clear weight of the evidence, somewhere in between the judgment n.o.v.

---

2. That term, antedating the advent of the smaller six-person jury in civil cases, was applicable to both criminal and civil trials. Judge Barnes carried his "thirteenth juror" approach to the point of strong adherence to the English practice of commenting extensively on the evidence. Though that is still legally permissible in the federal system, this Court does not practice it at all.

test and a straight second-guessing of what the jury has done. *General Foam Fabricators, Inc. v. Tenneco Chemicals, Inc.,* 695 F.2d 281, 288 (7th Cir.1982), quoting from the even lesser statement of the standard ("against the weight of the evidence, ... the damages are excessive, or ... for other reasons, the trial was not fair to the party moving") in *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940).

Finally and relatedly, the standards for reviewing the size of a jury award are relevant here. As for compensatory damages, *In re Innovative Construction Systems, Inc.,* 793 F.2d 875, 887–88 (7th Cir. 1986) (citations omitted) recently described the test this way:

> Only if the award is "monstrously excessive," ... a product of passion and prejudice, ... or if there is no rational connection between it and the evidence, ... may the court disturb it. Underlying this deference to a jury's assessment of damages is the acknowledgement that "the actual measure of damages is an exercise in fact-finding," ... and any rule on the scope of the judge's control of the jury has Seventh Amendment implications.

*Innovative Construction, id.* at 887 n. 11 and, even more recently, *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979 (Lux v. McDonnell Douglas Corp.),* 803 F.2d 304, 318 n. 12 (7th Cir. 1986) also point up the need for comparability in damage awards among similar cases.

It must however be said, as Judge Campbell's *Van Houdnos* concurrence suggests, that the decisions often give more lip service than real effect to the deferential kind of statement exemplified by *Innovative Construction.* This subject will be dealt with at some length later in this opinion.

As for punitive damages, now-familiar doctrine in Section 1983 actions teaches they are not awardable unless the individu-

al "defendant's conduct is shown to be motivated by evil motive or intent, or ... involves reckless or callous indifference to the federally protected rights of others" (*Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983)).[3] Because such damages are specifically devised to punish—to "send a message" to the individual governmental officer (for they cannot legally be awarded at all against City)—a court reviewing an award of punitive damages should be at least as sensitive to the kinds of considerations identified in *Innovative Construction* as it is in considering compensatory damages.

One last consideration should be identified at the outset: Section 1983 is not a generalized guaranty of fairness in employee relations. Governmental employers may be mistaken and even arbitrary in dealing with their employees. They may (as Mathis was accused of here) break promises that no early (or wholesale) personnel changes will take place. But governmental defendants will not be subject to *federal* liability unless their conduct masks constitutionally forbidden mistreatment (such as politically- or racially-motivated mistreatment). Even though the jury instructions in this case sought to deliver the message that only conduct in the latter categories could result in a verdict for each plaintiff, the jury's failure to differentiate among the plaintiffs—some of whom presented no evidence at all in one or both of those respects—demonstrated a failure to follow the instructions. This Court must deal with the extent to which a verdict so tainted can be salvaged.

It is against that framework that the several questions posed by the jury's verdict and defendants' post-trial motions must be reviewed. This opinion turns to that task.

---

**3.** This Court's instructions to the jury in this case included a careful definition of those terms (accepted by both sides), drawing not only on *Smith v. Wade* but on the more conventional punitive damages instruction in 3 Devitt & Blackmar, *Federal Jury Practice and Instructions* §§ 85.11 and 96.17 (3d ed. 1977), specifically approved by our Court of Appeals (post-*Smith v. Wade* ) in *McKinley v. Trattles,* 732 F.2d 1320, 1326 & n. 2 (7th Cir.1984); and see the more extended discussion in *Soderbeck v. Burnett County,* 752 F.2d 285, 289–90 (7th Cir.1985).

## Race Discrimination

There is no question the jury could rationally have decided, as it did, that Mathis' decision to reassign plaintiffs out of OMI (1) was "substantially motivated" by the fact they were white and (2) would not have been made without reference to plaintiffs' race—or at least that was so as to *some* plaintiffs. When Mathis took over OMI he found a unit with 32 police officers assigned to it,[4] 28 of whom were white males, three of whom (less than 10%) were black males and one of whom (3%) was a female Hispanic who had been assigned there only a week earlier. Nothing in the record established whether the substantial disparity between those ratios and the racial makeup of the Police Department (which has in the past itself been found warped against minorities, see *United States v. City of Chicago*, 549 F.2d 415 (7th Cir.1977)) was the result of prior race and sex discrimination. Former OMI Executive Director James Maurer (a high-ranking white Police Department officer with first-rate credentials) had staffed the unit with personnel he knew and trusted, and those people (perhaps not surprisingly, given his own background) "happened" to have been almost all white males. But so far as the jury and this Court were concerned, there was no proof (apart from the sheer numbers) to suggest that blacks, women and Hispanics had been the victims of discriminatory treatment in setting up the OMI unit.

In any case, the objective evidence reflected Mathis found the disparities disturbing and he resolved to do something about it. Here is a memorandum he sent to the Mayor's Chief of Staff William Ware shortly after Mathis' appointment (Pl.Ex. 1, emphasis in original):

> The undersigned wishes to share with you the status of personnel assigned to O.M.I. at the time I assumed command of this department, specifically its Affirmative Action posture.
>
> [Tabular listings followed, giving the numbers of "Sworn Personnel" (police officers) and "Civilian Personnel," broken down in each instance as to "Male" and "Female" and, within each of those categories, as "White," "Black" and "Hispanic"]
>
> As this data indicates, Affirmative Action concepts *do not exist* in this department, either in its civilian or police components.
>
> Due to the obvious constraints in dealing with the civilian career service personnel, resolving this imbalance will be a long range goal. However, in reference to the police personnel, this is being dealt with immediately.
>
> Further reports on this progress will follow.

What Mathis did was to bring in officers *he* knew and trusted, or who were recommended to him by others whom he knew and trusted. After Mathis had made the transfers out and in, the unit more closely mirrored Chicago's racial population percentages.

It is true that a number of the new people Mathis brought in (13, to be precise[5]) were white males, most of whom by definition replaced white males (for the most part, the record did not reflect one-on-one replacements, so it is impossible to be

---

**4.** OMI is not itself a unit of the Chicago Police Department. It is a separate agency of City government, with responsibility running directly to City's Mayor (at the time relevant to this case, Mathis reported to the Mayor's then Chief of Staff William Ware). In 1984 OMI's complement was equally divided between civilian and police officer personnel, the latter being assigned from the Police Department on detached duty. Police personnel were subject to transfer at any time—they had no due process property interest in their OMI assignments.

**5.** It is sheer coincidence that number is identical to the number of plaintiffs in this case.

Only the 13 plaintiffs elected to sue, out of 26 white males who were in OMI when Mathis arrived and were transferred out of OMI. As the text at n. 4 indicates, there were 28 white male police officers at OMI when Mathis took over the top position there. Two of them were retained in the unit and 13 white males were transferred *in* as part of Mathis' personnel changes, so that by September 1, 1984 the number of white males had dropped to 15, out of a total of 32 police officers on assignment to OMI (Pl.Ex. 2).

precise in that respect). In that sense it becomes hard to support (for example) the verdict as to the five plaintiffs who were transferred out at the time when their direct replacements were principally white officers, or as to the last three plaintiffs who asked to be transferred out even later because (as they testified) they felt the handwriting was on the wall. This is one of the problems of having plaintiffs sue en masse rather than as individuals, for the jury is apt to make collective rather than individual decisions (as this jury obviously did).

Neither side has paid enough attention post-trial (just as they did not in closing argument) to the legal significance of the factual differences among the plaintiffs. In closing argument, such attention could have been aimed at assuring a properly fine-tuned, rather than a blanket, jury verdict. Now, after the trial, such attention should have been aimed at the extent to which the jury's interrogatory responses and verdict can be sustained. Lacking proper input from the litigants in these areas, this Court has been unable to do the job for itself—in substantial part because it was not furnished the trial transcript and has had to rely on its own necessarily incomplete (though extensive) trial notes.

■ Accordingly, more is required from the parties. Even after due weight is given to the jury's resolution of factual issues in plaintiffs' favor, the operative principles are these:

1. Plaintiffs DiMaggio and Cappitelli (who were in the first wave of transfers, in mid-June 1984) must be viewed as having been the subject of race-motivated treatment. Nothing further is needed as to them.

2. Any plaintiff who, during that early period when the unit was in flux and the incoming replacements were largely members of minorities, was told by a superior [6] that his transfer was imminent was not required to wait for that shoe to drop. Even though the transfer of such a plaintiff out of the unit may have been at his own request (to maximize his chance to get a Police Department reassignment of his own choice), the jury's finding that he was the victim of race-motivated treatment will be honored. This Court's trial notes do not fully confirm whether or not plaintiffs Capesius, Gartner and Wojnar fall into that category. Accordingly the parties are required to provide further input as to the trial record in that respect regarding those plaintiffs.

3. Five plaintiffs (Cygnar, Flanagan, O'Driscoll, Rubino and Shanahan) were transferred out as part of a group of eight transferees July 25, 1984. Seven officers were transferred into the OMI unit that day and the following day— four of them (like the five plaintiffs) were white males, one was a woman and two were black males. On the face of things, that would not appear to be reconcilable with a finding of *race* discrimination, as contrasted with the concept of Mathis' reconstituting the unit with people in whom he had confidence (see n. 6). Plaintiffs' counsel has not really addressed this issue in a focused way, and that too must be done (together with simultaneous input from defense counsel).

4. Any plaintiff who was transferred out of OMI at his own request, doing so at a time after the transfers (out and in) referred to in the preceding paragraph, cannot support a claim of race-motivated

---

**6.** This need not have been Mathis or his Director of Operations Arthur Lindsay. On the other hand, it must have been more than a product of the rumor mill to support a proximate cause finding (necessary in this area of the law as in any other). Once more it should be underscored that *facts,* and not just plaintiffs' *beliefs,* are necessary to support the jury determination of race-motivated factors. If the objective facts are consistent with Mathis' statement that he was trying to reshape OMI with his own people, and that meant transferring plaintiffs out not because they were white but because they were former Executive Director Maurer's men, it is of no legal significance that the transfers may not be independently justifiable as "merit" transfers—that plaintiffs were good (or even excellent) officers.

transfer by Mathis. Even on the dubious premise that such a voluntary act can be laid at Mathis' doorstep (on some kind of constructive-discharge theory), once a substantial part of the OMI officer personnel intake was clearly white—the July 25–26, 1984 situation—the idea of later voluntary transfers being race-based is at war with the evidence. Plaintiffs Bleke and Riggio clearly appear to be in this group, and plaintiff Murray surely is (on his own testimony, his direct replacement was a white officer).

In summary, given the stringent standards required for a judgment notwithstanding the verdict, this Court cannot conscientiously overturn what the jury decided as to *liability* (as distinct from damages, to be discussed later) on the race issue as to a number of the plaintiffs. However, further submissions from the parties are required to define just which plaintiffs are and which are not in that group.

### Political Discrimination

No such credence can be given to the jury's determination as to Mathis' having been politically motivated. Only one bit of evidence could even arguably support the notion any plaintiff's transfer was "substantially motivated" by his political affiliation: the fact some plaintiffs had been purchasers of tickets to. one or more former Mayor Byrne fundraiser dinners, plus some limited testimony that there was a manila folder among the OMI files that contained some kind of list of purchasers (whether related to one or more Byrne functions was not clear).[7]

■ There was however no evidence (other than a highly attenuated possible inference) that folder was ever known to— let alone seen by—Mathis. Plaintiff Murray originally testified the folder was among those taken in by secretary Karen

Danzig for Mathis' perusal, in response to Mathis' request for financial budget information when he first came into OMI. Later Murray diluted his testimony to a version in which Ms. Danzig merely told him she was bringing the contents of some file cabinets to Mathis, coupled with Murray's testifying he knew the Byrne ticket-purchase folder was in one file cabinet. Ms. Danzig was not called to testify. Murray's hearsay statement (because it was not objected to on hearsay grounds, it was not stricken by this Court) was flatly contradicted by Mathis' testimony he never knew of or saw any such folder.

Though this Court will not engage in the "thirteenth juror" business, substantial doubt must attach to a finding based on such a weak foundation. Perhaps even more to the point in that respect, the jury made the identical "substantially motivated" finding as to *every* plaintiff, and yet:

1. Not all the plaintiffs even bought such tickets, so there was no evidence of their support for Mayor Washington's political opponent that could possibly be brought home to Mathis.

2. Plaintiff Capesius actually testified he had "talked up" Mayor Washington during the 1983 campaign—quoting his close friend Melvin Alexander (a black, now head of OMI) as to Washington's "not [being] supposed to be a bad guy."

Much of plaintiffs' evidence in this area was a melange of non-probative material: matters going to someone's being a "supporter" (in undefined terms) of Byrne or even (a total irrelevancy, see n. 8) Republican mayoral candidate Epton. As *Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir. 1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982) put the matter:

A disgruntled employee fired for legitimate reasons would not be able to satis-

---

7. Two plaintiffs testified as to the existence of such a folder. Former OMI Director Maurer and his Director of Operations Paul Lewis, however, did not testify to knowing of its existence. Plaintiffs did not call to the stand the secretary who was said to have collected the OMI files (purportedly including such folder) for delivery

to Mathis when he asked to see the unit's financial files upon his arrival at the unit. Under the standards applicable to post-trial motions, however, this Court credits the existence of the folder (notwithstanding the doubts created by the record).

fy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election.

Accord, *Patkus v. Sangamon-Cass Consortium,* 769 F.2d 1251, 1259 (7th Cir.1985). Nor does it make a difference that defendants were not aggressive in keeping those non-probative matters from the jury by interposing timely objections to plaintiffs' generalized testimony.

What is plain is that the jury went seriously astray on the political-transfer issue. Substantial doubt exists as to adequate support for that finding as to *any* plaintiff. In all events, given the manifest error of the finding as to *some* of the plaintiffs, coupled with the jury's identical treatment of all (with or without even a scintilla of evidence as to some), the only conclusion must be the jury was drawing impermissible inferences. And that conclusion vitiates the entire verdict in this area. Contrast *MCI Communications Corp. v. American Telegraph and Telephone Co.,* 708 F.2d 1081, 1167 n. 121 (7th Cir.1983) (refusal to grant new trial where, unlike this case, the claimed 'taint of jury's findings was wholly speculative).

In sum, the problem here is one plaintiffs and their counsel have created for themselves. No effort was made in closing argument to distinguish among plaintiffs based on the total differences in proof. This Court is not required to reconstruct and rehabilitate a clearly erroneous jury verdict. Judgment n.o.v. must be granted on this claim.

### Mathis' Qualified Immunity

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) set an objective rather than subjective standard for individual (not municipal) defendants in Section 1983 cases:

> [They] are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

That standard has special poignancy here because only Mathis, not City, is vulnerable to punitive damages under Section 1983 (*City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981)), so if Mathis is legally immune from liability the bulk of plaintiffs' damage award is nonrecoverable.

Mathis' entitlement to immunity does not depend on identifying a "white horse" case—one identical in all respects to the situation in which he acted, either imposing or rejecting liability on a governmental official. On the contrary, the post-*Harlow* teaching of the Supreme Court is that district courts "need determine ... a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged action" (*Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985)) —or as *Mitchell, id.,* 105 S.Ct. at 2820 later put it:

> [H]indsight-based reasoning on immunity issues is precisely what *Harlow* rejected. The decisive fact is not that [the government officer's] position turned out to be incorrect, but that the question was open at the time he acted.

*Benson v. Allphin,* 786 F.2d 268, 274 (7th Cir.1986) makes it plain (as does *Mitchell*) that the qualified immunity defense presents a question of law addressed to this Court and not the jury. *Benson, id.* at 275–76 then goes on to explain the operation of the "clearly established" concept in situations where application of the constitutional standard is "fact dependent." This opinion turns then to that entire subject as to both kinds of motivations found by the jury: political and racial.

### 1. Politically-Motivated Transfers

Analysis in this area of the case poses an anomaly, for this opinion has already demonstrated the jury plainly went astray in ascribing political motivation to Mathis in making the OMI transfers. In light of the total absence of evidence on this score as to a number of plaintiffs, the jury's uniform

"yes" answers as to *all* plaintiffs taints their whole verdict in this respect.

For present purposes, however, Mathis' counsel is called on to make an arguendo assumption: Had Mathis in fact been substantially motivated by political considerations in transferring plaintiffs out and their replacements in,[8] would that have violated "clearly established" legal norms in the spring of 1984? In other words, the jury's answer to the political-motivation question will be accepted at face value in this section of this opinion.

Two factors must be remembered here:

1. What was involved in this case was not a firing or even a demotion, but rather a transfer of each plaintiff from one assignment to another. Nor was this an exile to Siberia—a transfer to pounding the beat in some remote outpost. In every instance, plaintiffs returned to other assignments commensurate with their rank and experience. True enough, they perceived OMI to be a prestige assignment with some cushy aspects (though those were not matters of entitlement that would create a property interest), but this situation had none of the egregious aspects that have marked political-motivation cases before now.

2. OMI was a sensitive unit, engaged in investigations of governmental corruption and all other kinds of governmental employee misconduct. Experience has taught such misconduct is color blind and cuts across all lines of political allegiance. At least arguably an appointing officer could want to assure the allegiance of his investigatory personnel (for example, to guard against leaks, a matter discussed hereafter), so that political loyalty could be relevant even in a department that was not "political" as such.[9]

It is against this backdrop that the then-contemporaneous legal norms must be examined.

By the spring of 1984 it was well established that political considerations could not motivate public employee *firings* generally. See *Tomczak v. City of Chicago*, 765 F.2d 633, 635 (7th Cir.1985). But as *Soderbeck v. Burnett County*, 752 F.2d 285, 291 (7th Cir.1985) put it (albeit in the context of the awardability of punitive damages, not qualified immunity as such):

But the discharge of public employees on political grounds is not yet regarded in the light of something contrary to natural law; nor is it widely known in nonlegal circles to be a federal constitutional tort or any other sort of tort.

And it must be remembered that what was involved here was *not* a firing of any of the plaintiffs. It was certainly not "clearly established" in the spring or summer of

---

**8.** It will be recalled Maurer transferred a substantial number of white officers into OMI. There was not even a hint in the evidence suggesting Mathis knew anything about their politics, or indeed suggesting what those politics were. One of the most unfortunate aspects of the trial was that (to make a bad pun) plaintiffs' proof tended to portray everything in black-and-white terms. Instead of real proof on the political-motivation claim, which was so thin as to vanish entirely for several of the plaintiffs, what was offered was an appeal to stereotypes: Whites must have supported Byrne or Epton (the latter a total irrelevancy, for there was not even a whisper of *that* fact conceivably being known to Mathis), blacks must have supported Washington. That approach obviously sold the jury (their uniform responses to the special interrogatories about political affiliation and race showed that one-to-one correlation, though the evidence did not support that result on any rational view), but it really muddied the waters

in legal terms. This lawsuit would have been far better posed by plaintiffs' counsel for what it was—involving race-conscious conduct by a high-ranking City official. In any event, even taking plaintiffs' own racially polarized stereotypes of political affiliation on their own terms, Mathis' transfer of 13 new *white* officers into OMI undercuts the political-motivation contention.

**9.** This admittedly draws on conjecture, but that is inevitable where a defendant denies political motivation and the question becomes the hypothetical one of the legal standards for an official's conduct *if* it were so motivated. As *Wade v. Hegner* (discussed later in the text) teaches, once the jury has found against the defendant on the intent issue as to (say) the political motivation for dealing with an employee, intent is no longer relevant to the objective good-faith inquiry under *Harlow*.

1984—nor indeed is there case law even today holding—that a transfer of the sort involved in this case—a lateral one within a large organization that has frequent reassignments, involving no loss in rank or pay, giving the transferee the opportunity to designate his preferences for new assignments and placing the transferee into exactly the same working conditions as the vast bulk of his peers with the same organizational rank—could not constitutionally take politics into consideration.

■ That alone confers the *Harlow*-dictated qualified immunity on Mathis. But it should also be added that it remains permissible even today to take employment action (even firings) for political reasons where "confidential" employees are involved. *Soderbeck, id.* at 288 makes plain that concept is not at all limited to high-ranking employees. That principle has been expanded upon in *Meeks v. Grimes,* 779 F.2d 417, 420 (7th Cir.1985):

> Thus our attention turns to the second type of office for which politics is a constitutionally permissible job criterion; these positions can be generally described as "confidential." This is a catchall phrase that encompasses those government employees who, while not decision makers, are in close contact with policymakers and the highly confidential communications or records affecting decisions. *See Soderbeck,* 752 F.2d at 288 ("You cannot run a government with officials who are forced to keep political enemies as their confidential secretary...."). The basis for exempting this type of employee is that political antipathy can serve as a decent proxy for a lack of trust and loyalty where the employee's responsibilities include a duty to shield the decisionmaking process from the outside world. The possibility of "leaks" from employees with access to sensitive information is a constant threat to any unit of government.

■ Both *Soderbeck* and *Meeks* teach the characterization of particular employees (bailiffs in *Meeks*) as being "confidential" or not "confidential" is factual, not solely legal, in nature. But it should be stressed the question for qualified immunity purposes is not whether OMI people—dealing as they do with sensitive and confidential investigations—are necessarily "confidential" employees as a matter of law. Rather the question is whether it was clearly established when Mathis acted that they were *not* "confidential" employees. It was not so established then, and that independently shields Mathis with qualified immunity.

Again, it must be emphasized, all this has given plaintiffs the benefit of the jury finding as to Mathis' political motivations, despite its already-explained dubiousness. But even with that benefit, all plaintiffs must lose on their political-motivation claim against Mathis, on grounds of his qualified immunity.

*2. Racially-Motivated Transfers*

Here the jury found Mathis' reassignment decisions were "substantially motivated by the race of [each] plaintiff." That was certainly a logical conclusion from the evidence in the case as to at least some of the plaintiffs, and it would be irresponsible even to consider dishonoring that finding.

Under *Wade v. Hegner,* 804 F.2d 67, 69–70 (7th Cir.1986) that finding of Mathis' subjective intent is relevant to the inquiry whether his decision was race-motivated, but not as to his "good faith" for immunity purposes. On that latter score the objective inquiry mandated by *Harlow* remains controlling (*Wade, id.* at 70), and this opinion turns to that inquiry.

No area of constitutional law has been more unsettled than that gathered under the rubric of "affirmative action": the use of race-conscious governmental decisions to correct perceived existing racial disparities. Just this past May—fully two years after the events in this case—*Wygant v. Jackson Board of Education,* —— U.S. ——, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) revealed a badly splintered Supreme Court on a whole congeries of issues in this area, including importantly the standard to be applied "to test the validity of the means chosen by

[public officials] to accomplish ... race-conscious purposes" (*id.*, 106 S.Ct. at 1849).

In *Wygant* the Court of Appeals for the Sixth Circuit, 746 F.2d 1152 (6th Cir.1984) had approved race preferences for public employee layoffs based solely on the statistical underrepresentation of minorities, even absent any findings of past discrimination. *After* Mathis had made the OMI transfers at issue in this case, our Court of Appeals stated its different understanding of Supreme Court precedent as requiring prior findings of past discrimination (and not just a statistical showing) as a precondition to affirmative action programs (*Janowiak v. City of South Bend*, 750 F.2d 557 (7th Cir.1984)). But the fact remains there was respectable authority looking only to statistical disparities—just as Mathis did—and it would be irrational to hold nonlawyer Mathis to a higher standard of conduct than Court of Appeals judges had actually approved.[10]

As for the question of the level of formality and the decisional level the affirmative action program had to take to pass constitutional muster, once again it cannot be said the law was clearly developed when Mathis acted. Plaintiffs rely heavily on the 1981 decision in *Lehman v. Yellow Freight System, Inc.*, 651 F.2d 520 (7th Cir.1981), which invalidated a private employer's claim of hiring black and other minority employees pursuant to an organized affirmative action program. But in *Lehman* the trial court found the individual plaintiff's hiring had *not* been done pursuant to the employer's nationally adopted plan (*id.* at 523–24), so our Court of Appeals had to

determine whether the local terminal manager's "informal decision to give [the black applicant's] race a plus factor and hire him is consistent with the Supreme Court's decision in [*United Steelworkers of America v.*] *Weber* [443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979)]" (*Lehman*, 651 F.2d at 525). In doing so the Court of Appeals said candidly (*id.*):

> Initially, we note the dearth of authority on this issue.

Then the *Lehman* decision went on to find *Weber* required a *need* for affirmative action (either the remedying of past discrimination or at least a statistical disparity, *id.* at 527) and "the existence of a time limit on the plan" (*id.* at 528).

In *Lehman* terms, it cannot be said it was "clearly established" what Mathis did was constitutionally impermissible. Mathis was the person with responsibility for shaping the OMI unit he had been appointed to head. He was obviously aware of the statistical disparity in representation of blacks, women and Hispanics at OMI—his before-and-after memoranda to the Mayor's Chief of Staff William Ware (Pl.Exs. 1 and 2) demonstrate that. And his implementation of his "hiring" policies (the result of transfers out of and into OMI) was really a one-time restructuring of OMI, containing its own built-in time limit. In short, nothing in *Lehman* (or, a fortiori, in the other pre-summer–1984 established case law) rejected Mathis' effort at correcting what he believed an improper racial imbalance[11] as a "clearly established" constitutional wrong.

---

10. Indeed, had Mathis looked at the lawbooks when he took his action, he would have found the then-unreversed District Court opinion in *Janowiak v. Corporate City of South Bend*, 576 F.Supp. 1461, 1467 (N.D.Ind.1983) had approved affirmative action based solely on the minorities' statistical shortchanging, "irrespective of the question whether there had ever been any overt or deliberate discrimination against minorities." Chief Judge Sharp found that conclusion to be consistent with existing Supreme Court holdings. When District Judges are later held by Courts of Appeal to have misread and misapplied Supreme Court authority (as occurred in *Janowiak* ), they suffer only reversal.

It is plainly rhetorical to inquire whether a non-lawyer public official can be held liable (and for punitive damages at that) for having done the same thing.

11. Once more this opinion accepts, as it must for these post-trial motion purposes, (1) the jury's rejection of Mathis' denial of his race-based motivations and (2) the jury's specific decision that Mathis "perceived [the reassignments] as a means to correct what he considered a previously-existing racial imbalance within O.M.I."

This should not be misunderstood as an *approval* of Mathis' actions. It does not represent a judgment that *City* should not be liable for plaintiffs' transfers, a question to be resolved in terms of the jury's factual findings (at least the sustainable ones) and *today's* constitutional law principles. Instead it reflects the determination that the operative principles were not so clear when Mathis acted as to cause him, in light of the qualified immunity to which governmental officials are entitled, to be mulcted in damages personally.

\* \* \*

In sum, application of the objective good faith standard established by *Harlow* spares Mathis. Judgment in his favor notwithstanding the verdict must be and is granted.

### Damages

What has gone before eliminates the jury's punitive damages verdict, representing five-sixths of the total awarded plaintiffs by the jury. Because this Court must recognize the possibility an appellate court may take a different hindsight view of the then-established constitutional law against which Mathis' actions must be measured, this opinion will look both at the compensatory and at the punitive damages in light of the principles quoted earlier in this opinion.

### 1. Compensatory Damages

This Court shares Judge Campbell's views as to the respect to be accorded jury determinations—as to both liability and damages. In a two-week period in 1983, chance caused this Court to preside over two strip-search cases in succession, the first of which (*Susan B. [v. City of Chicago* No. 83 C 228 (N.D.Ill.1983)], discussed in *Joan W. v. City of Chicago*, 771 F.2d 1020, 1023 n. 2 and 1024 (7th Cir.1985)) produced a damages verdict substantially below what this Court would have awarded had it been the trier of fact, and the second of which (*Levka*, discussed in *id.* at 1024 & n. 8)

produced a damages verdict substantially higher than this Court would have given.[12] This Court sustained both verdicts because it did not believe substitution of its views for the jury's (which is supposed to embody the collective conscience of the community) was called for. In short, this Court considered the second verdict, though personally perceived as too high, was not outrageously so.

Our Court of Appeals disagreed and vacated the $50,000 jury verdict as excessive, mandating its reduction to $25,000 via remittitur (*Levka v. City of Chicago*, 748 F.2d 421 (7th Cir.1984), and see the further discussion in *Joan W.*, 771 F.2d at 1024–25). *Levka* is only one of a substantial number of cases in which our Court of Appeals has delivered a clear message—despite its stated adherence to the rule this opinion has quoted from *Innovative Construction*—that Section 1983 verdicts for intangible harms are to be curbed within bounds that court perceives as reasonably supportable: see, e.g., *Ustrak v. Fairman*, 781 F.2d 573, 578–80 (7th Cir.1986) (reducing both compensatory and punitive damages); *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1313–14 (7th Cir.1985) (same); *Taliferro v. Augle*, 757 F.2d 157, 162 (7th Cir.1985) (reducing compensatory but not punitive damages); cf. *Phillips v. Hunter Trails Community Association*, 685 F.2d 184, 190–91 (7th Cir.1982) (same in Section 1982 case); and see *Hamilton v. Svatik*, 779 F.2d 383, 389 (7th Cir.1985) ($12,000 "award for intangible injuries ... comes very close to being excessive" in Section 1982 case).

Because the jury here gave each plaintiff $55,000 in compensatory damages despite sharp variances among them in any asserted *economic* harm, plaintiffs have been backed into the corner cf attributing *all* that award to intangible harms (Pl. Post-Trial Mem. 43). That means the jury put a

---

**12.** Because City had then acknowledged its prior uniform policy of strip-searching all female arrestees violated the Constitution, only the damages issue was put to each jury.

$55,000 price tag on each plaintiff's humiliation and emotional distress.[13]

Under the cases that is simply much too much. As to each plaintiff who remains entitled to any award for what the jury found to have been his race-motivated transfer, this Court grants defendants' motion for a new trial (limited solely to·damages) unless—at his option—that plaintiff accepts a remittitur to $15,000.[14]

### 2. Punitive Damages

As already discussed, punitive damages (awardable in any case only against Mathis, not against City) can be sustained only if this Court's holding of Mathis' qualified immunity were rejected. Though what follows should not be taken as an expression of any doubt on that legal question, orderly jurisprudence suggests the punitive damages issue might appropriately be discussed briefly on that arguendo assumption.

What has already been said about the excessiveness of the jury's verdict on compensatory damages applies here as well (and see *McKinley v. Trattles*, 732 F.2d 1320, 1327–28 (7th Cir.1984), requiring a remittitur in a punitive-damages-only review). At the $15,000 level already specified in the preceding section for the alternative option of a compensatory damages remittitur, plaintiffs are at the outer reaches of appropriate recovery for the harms they have sustained. Anything more than a nominal additional figure for deterrence and punishment would distort the justice system and provide an unwarranted windfall to plaintiffs. *Ramsey*, 772 F.2d at

1314; *McKinley*, 732 F.2d 1328. Indeed *Ramsey* makes the obvious point that the excessiveness of a compensatory damages award "strengthens our conviction that the jury also improperly awarded punitive damages" (772 F.2d at 1314).

Accordingly *if* this Court were to be reversed on the qualified immunity question, it would grant Mathis a new trial, *both* as to liability and as to damages, on the issues relevant to the award of punitive damages. That would apply to each plaintiff entitled to any award at all unless—at his option—such plaintiff were to accept a remittitur to $5,000 in punitive damages.

### Conclusion

Judgment notwithstanding the verdict is granted in favor of defendant Mathis against all plaintiffs. Because the Supreme Court has held that the message-giving concept of punitive damages cannot apply to a municipal defendant such as City, that eliminates plaintiffs' recovery of any part of the punitive damages award in this case.

Judgment notwithstanding the verdict is granted in City's favor and against all plaintiffs as to plaintiffs' political-discrimination claim (Complaint Count III). As for plaintiffs' race-discrimination claim (Complaint Count IV):

1. Judgment notwithstanding the verdict is granted in City's favor against each of plaintiffs Bleke, Murray and Riggio, but denied as to plaintiffs Cappitelli and DiMaggio.

---

**13.** Pl. Post-Trial Mem. 46 also refers to their suffering a claimed stigma from being labeled by fellow officers at their new assignments as "politicians," "political hacks" or "spies." That poses an interesting question in view of this opinion's rejection of their political-transfer claim: Can plaintiffs recover for damages allegedly caused by a *false* perception of the reasons for their transfers? Because that claimed additional factor is still an intangible harm, it should make no difference in result and will therefore not be explored.

**14.** *Ramsey*, 772 F.2d at 1313 described $35,000 as "the outermost award that can be supported

on this record" in a far more egregious race-discrimination situation, citing (with apparent favor) other cases upholding (sometimes as a "maximum"), or reducing awards to, a $10,000 range. And as already stated in the text, *Hamilton*, 779 F.2d at 389 said last year of a $12,000 award "for intangible injuries such as humiliation, emotional distress and embarrassment":

Although the award for intangible injuries here comes very close to being excessive, we cannot say that this award "shocks our conscience."

*Hamilton* too cited with approval other awards in the $10,000 range.

2. Further submissions are required from counsel for both sides on or before January 13, 1987 as to two groups of plaintiffs:

(a) Capesius, Gartner and Wojnar; and

(b) Cygnar, Flanagan, O'Driscoll, Rubino and Shanahan.

However, as to plaintiffs Cappitelli and Di-Maggio (and as to any of the plaintiffs as to whom such further submissions do not result in a judgment in City's favor notwithstanding the verdict), new trials as to damages on the race-discrimination issue are granted—unless, at each such plaintiff's option, a remittitur to $15,000 on that claim is accepted.

Finally, if and to the extent any of these rulings granting judgment notwithstanding the verdict may be reversed on appeal, a new trial is awarded as to *both* liability and damages—unless, again at each plaintiff's option, a like remittitur to $15,000 is accepted. If this Court's granting of judgment notwithstanding the verdict as to punitive damages were to be reversed, again a new trial as to both liability and damages is awarded—unless, at each plaintiff's option, a remittitur to $5,000 on such claim is accepted.